STATE OF NORTH CAROLINA v. JAMES VEREEN, A/K/A ONION

No. 633A83

(Filed 8 January 1985)

1. **Constitutional Law § 63; Criminal Law § 135.3— exclusion of jurors opposed to death penalty**

    The exclusion of jurors who were unequivocally opposed to the death penalty did not violate a murder defendant's right to a fair trial and his right to due process of law.

2. **Criminal Law § 91.6— pretrial publicity and prejudicial bias — additional time to gather information — denial of continuance**

    A murder defendant's rights to the effective assistance of counsel and due process of law were not violated by the trial court's denial of a continuance to give defendant's expert additional time to gather information pertaining to pretrial publicity and community prejudice in support of his motion for a change of venue where defendant's trial had been delayed for four years because of defendant's actions in removing himself from the jurisdiction; on 16 September 1983 the trial judge allowed defense counsel funds to hire an expert to survey the extent and effect of pretrial publicity and prejudicial bias in the community, scheduled a hearing on defendant's motion for a change of venue for 7 November, and scheduled the trial for 28 November; defendant moved on 3 November to continue the hearing and the trial for the convenience of defendant's expert; and the trial court concluded that the six weeks allowed by the court's prior order for defendant to prepare for the hearing on the motion for a change of venue was reasonable. G.S. 15A-701(b)(7).

3. **Criminal Law § 15.1— community bias and publicity — denial of change of venue**

    A murder defendant failed to show that under the "totality of the circumstances" he was deprived of a fair and impartial jury by the denial of his motions for a change of venue on grounds of bias in the community and pretrial and trial publicity where the county of trial had a population of 34,000, and the entire county thus did not qualify as a "neighborhood"; there was no evidence that the victim was well-known throughout the county; six of the jurors ultimately selected stated that they did not know defendant and knew nothing about the case, and the remaining six jurors indicated that they had only vague recollections about the case, had formed no opinion of defendant's guilt or innocence, presumed defendant innocent until proven guilty, and could render a fair and impartial verdict; the publicity consisted of factual, noninflammatory news stories; and the jury was repeatedly admonished throughout the trial to avoid all media accounts of the trial and to refrain from discussing the case.

4. **Criminal Law § 60— palm prints — nontestimonial identification order — defendant in custody**

    Although G.S. 15A-271 did not apply to a defendant in custody and a nontestimonial identification order was not required for the State to acquire

an additional palm print from defendant during the trial, the fact that the State chose to comply with the more restrictive procedures of G.S. 15A-271 in obtaining a nontestimonial identification order worked to defendant's advantage, and the trial court did not abuse its discretion in issuing the order where defendant failed to show that he was prejudiced by the taking of his palm print during trial.

**5. Criminal Law §§ 42.5, 96— withdrawal of evidence—absence of prejudice**

In a prosecution for first-degree murder, the trial court did not err in the denial of defendant's motion for a mistrial when the court admitted and subsequently withdrew from evidence the victim's pocketbook and items therein which were discovered in an abandoned house located on the street where defendant lived since (1) the evidence was properly excluded because the pocketbook was discovered three weeks after the murder and there was no evidence to connect it to defendant, and (2) the probable influence of the evidence upon the minds of the jury in reaching a verdict was slight when the remoteness of the evidence is considered with the trial judge's instruction to disregard it.

**6. Homicide § 21.5— first-degree murder—sufficient evidence of premeditation and deliberation**

There was sufficient evidence of premeditation and deliberation to support submission of an issue as to defendant's guilt of first-degree murder where the evidence tended to show that the viciousness and brutality of the attack upon the seventy-two-year-old victim was unprecedented in the experience of the physician conducting the autopsy, and where the numerous wounds, including defensive incisional wounds to the victim's hands and arms, her broken ribs, evidence of strangulation and evidence of sexual assault indicated that the victim underwent extreme physical pain and unspeakable psychological anguish prior to her death.

**7. Criminal Law § 135.8— two aggravating factors—submission on same evidence —absence of prejudice**

In a prosecution for first-degree murder, defendant was not prejudiced by the trial court's error in submitting two aggravating factors—that the murder was committed while defendant was engaged in the commission of the crime of first-degree burglary or an attempt to commit first-degree rape and that the murder was part of a course of conduct involving other crimes of violence—based on the same evidence of an attempt to rape the victim's daughter, where there was ample evidence of first-degree burglary and assault on the victim's daughter to support these two aggravating factors without the necessity of relying on the crime of attempted rape; evidence of the attempted rape was the weakest of the crimes submitted to support the aggravating factors; and in light of the vicious brutality of the crimes and the absence of any significant factors in mitigation, there could be no reasonable possibility that consideration of the crime of attempted rape under one, the other, or both aggravating factors might have contributed to the imposition of the death penalty in this case.

**8. Criminal Law § 135.10— proportionality of death sentence**

A sentence of death imposed on defendant was not disproportionate considering both the crime and the defendant where the evidence showed that the seventy-two-year-old victim was strangled, stabbed and sexually assaulted in her home; defendant sexually assaulted the victim's mentally retarded daughter, stabbed her numerous times, and inflicted a nearly fatal cut to her throat; the knife wounds were inflicted with such force that the murder weapons, a serrated steak knife and a pocketknife, were both broken when discovered at the scene of the crime; and defendant offered little in mitigation of the offense.

**9. Criminal Law § 135.10— death penalty—proportionality review**

Although the U. S. Constitution does not require a comparative proportionality review of a death sentence, that requirement is mandated by G.S. 15A-2000(b)(2).

**10. Criminal Law § 135.10— death sentence—proportionality review**

Although the cases in the pool of cases for proportionality review offer guidance in determining whether a sentence of death in a particular case is excessive or disproportionate, ultimately each case must rest on its own unique facts.

Justice VAUGHN did not participate in the consideration or decision of this case.

BEFORE *Herring, J.,* at the 17 October 1983 Criminal Session of Superior Court, VANCE County, defendant was convicted of first-degree murder. From the imposition of a sentence of death, defendant appeals as a matter of right. N.C.G.S. § 7A-27(a). Heard in the Supreme Court on 13 November 1984.

Defendant was convicted of the first-degree murder of seventy-two year old Geraldine Abbott whose body was discovered in her home in Henderson, North Carolina, during the early morning hours of 30 September 1979. On appeal to this Court, defendant challenges the constitutionality of the jury selection process; the trial judge's rulings on a motion for continuance and motions for a change of venue; certain evidentiary rulings; the sufficiency of the evidence on the question of premeditation and deliberation; and, with respect to the sentencing phase of his trial, the submission of two aggravating factors which he contends were based on the same evidence. We find no error in the guilt phase of defendant's trial. Although the trial judge erroneously instructed the jury concerning what evidence it might consider in determining the existence of two aggravating factors, we hold that the defend-

ant was not prejudiced thereby, and we therefore affirm the sentence of death.

*Rufus L. Edmisten, Attorney General, by Donald W. Stephens, Special Deputy Attorney General, and Ellen B. Scouten, Associate Attorney, for the State.*

*J. Henry Banks and Willie S. Darby, Attorneys for defendant-appellant.*

MEYER, Justice.

The record discloses the following facts pertinent to this appeal: The victim, Geraldine Abbott, lived with her thirty-year old mentally retarded daughter, Susie Abbott. In response to a telephone call from Susie, the victim's son arrived at his mother's home shortly after 2:30 a.m. on 30 September 1979, where he found his mother lying on the floor. Her underpants were pulled down to her knees. Her nightgown was soaked with blood. She appeared to be dead. His sister Susie was sitting naked on the floor with her throat cut and numerous incisional wounds on her body. Apparently Susie, who testified only at defendant's sentencing hearing, informed law enforcement officers that the assailant was a black man wearing a blue "uniform."

A search of the crime scene disclosed a shoe print traced in blood, ostensibly made by the sole of a tennis shoe, and two one dollar bills lying on the floor, one of which harbored a latent palm print in blood.

On the following day, 1 October 1979, SBI Agent Walker and two Henderson police officers, while investigating an unrelated incident, noticed a two-piece blue jogging suit hanging from a clothesline on the front porch of a house located less than a mile from the Abbott home. Upon returning to the house a short time later, Agent Walker asked for, and was given permission by the occupant of the house, James Vereen, to take the jogging suit. The defendant admitted ownership of the suit, explaining that he had recently purchased it, that it had gotten dirty, and that he had washed it that morning. The suit was still damp. When asked if he owned a pair of tennis shoes, defendant answered affirmatively and agreed to let Officer Walker take the shoes. In spite of its being washed, chemical analysis revealed positive indica-

tions of the presence of blood on the suit. The shoe print taken from the crime scene was consistent in shape, size, and design with the tennis shoes.

As a result of the investigation, the defendant was indicted for the murder of Geraldine Abbott on 8 October 1979. Efforts to arrest the defendant were thwarted, however, until 1983 when defendant, who had fled the State, was finally apprehended in New York.

While law enforcement officers described the discovery of the blue jogging suit leading to defendant's arrest as "providential," it is evident from the record that the prosecution was nevertheless forced to rely solely on circumstantial evidence at the guilt phase of the trial. During a hearing on pretrial motions, defense counsel challenged the competency of the eyewitness, Susie Abbott, to testify. In light of Susie Abbott's very limited mental ability, the prosecution judiciously chose to exclude the testimony of this witness during the guilt phase.

At trial, the prosecution's case in support of a first-degree murder conviction consisted of the following: In addition to testimony that there were positive indications of blood on defendant's jogging suit, and that the shape, size and design of the shoe print found at the crime scene were consistent with defendant's tennis shoes, the most incriminating evidence pointing to defendant as the perpetrator of the crime was testimony from Special Agent Ludas that the left palm print impressed in blood on the dollar bill found in the victim's home matched the palm print of the defendant taken during the course of the trial. The prosecution also introduced evidence through the testimony of SBI Agent Worsham that caucasian head hairs removed from the defendant's jogging suit were microscopically consistent with the head hair of the victim, Geraldine Abbott.

To support its theory that the murder was committed with premeditation and deliberation, the prosecution relied on the testimony of the medical examiner, Dr. Tate. In addition to two stab wounds, one of which was the fatal wound which penetrated the right and left ventricles of the heart, Dr. Tate noted ten other wounds, six incisional wounds to other parts of the body and four wounds to the index and middle fingers of the victim and to her wrist and left hand which he characterized as "defensive"

wounds. Severe bruising to the muscles of the victim's throat and a fracture of the hyoid bone indicated that the victim had been strangled. Dr. Tate also found numerous rib fractures and bruising on the lower left wall and a tear in the rear of the vagina. Of the close to 100 autopsies he had performed, Dr. Tate testified that he had never before seen this constellation of injuries to one person.

Defendant did not offer evidence at the guilt phase of the trial.

At the sentencing phase of the trial, the prosecution submitted three aggravating factors. In support of the first aggravating factor, that defendant had previously been convicted of a felony involving the use or threat of violence to the person, the prosecution offered evidence of defendant's 1969 conviction of common law robbery. The second aggravating factor submitted was that the murder was committed while the defendant was engaged in the commission of first-degree burglary or an attempt to commit the crime of first-degree rape. In support of this factor, the prosecution offered the testimony of Susie Abbott. She testified that she lived in the same house as her mother and that on the night of the murder she and her mother put on their nightgowns. As her mother was saying her prayers, a black man entered the bedroom, grabbed her mother around the neck, and carried her to Susie's bedroom. He stabbed her mother with a knife and said "You must die." The man then held Susie's head back and cut her throat. He also cut her genital area. He put her on the bed, forced her to disrobe, and, with his clothes off, attempted to have intercourse with her. He then proceeded to cut her about her hips. Susie Abbott also testified that the man then took their pocketbooks and left. Neither Susie nor her mother gave the man permission to come into their home or take their pocketbooks. She did not consent to having sex with the man.

In support of the third aggravating factor submitted, that the murder of Mrs. Abbott was part of a course of conduct which included the commission by the defendant of other crimes of violence against other persons, the prosecution relied on evidence that defendant committed the crime of assault with a deadly weapon with intent to kill inflicting serious injury on Susie Abbott, as well as the crime of attempted rape against Susie Abbott.

Defendant offered the testimony of his aunt in support of the following mitigating factors which he couched in the following language:

(3) Does the affection between the defendant and his family constitute a mitigating circumstance, i.e., taking care of his grandmother who was a double amputee?

(4) Did the defendant confess and accept Christ at some point in his life?

(5) Was the defendant active in church, the boy scouts, and the boys' club during his youth so as to constitute a mitigating circumstance?

(6) The defendant has led a law abiding life for a substantial period of time before the commission of the present crime.

In addition, defendant submitted in mitigation his age (30); that he had no significant history of prior criminal activity; and any other circumstance which the jury deemed to have mitigating value. The jury found each of the three aggravating factors and indicated, without specifying, that it found from the evidence the existence of one or more mitigating factors. Upon finding that the aggravating factors outweighed the mitigating factors and that the aggravating factors, when considered with the mitigating factors, were sufficiently substantial to warrant a penalty of death, the jury recommended that the defendant be so sentenced.

Prior to discussing defendant's assignments of error, we deem it appropriate to comment on the fully competent representation of counsel afforded this defendant at trial and on appeal, as well as the caution and sound judgment displayed by the trial judge and the professional approach taken by the prosecution. Defense counsel, by well-researched and well-reasoned arguments both at trial and on appeal focused attention on the critical issues and set out persuasive arguments. As a result of defense efforts and discretionary rulings on the part of the trial judge, defendant was appointed additional counsel, and, at the expense of the State, was allowed funds to hire experts to verify the results of physical evidence and to conduct a county survey in an effort to obtain a change of venue. Counsel's motions and objections were

timely and, under the circumstances of the case, appropriate. The record discloses a trial skillfully conducted in an adversarial but orderly manner.

[1] As his first assignment of error, defendant contends that exclusion of jurors who were unequivocally opposed to the death penalty violated his right to a fair trial and his right to due process of law. This Court has consistently rejected the argument as set forth by the defendant. *See State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189 (1984). We decline to reconsider our position.

[2] Defendant contends that he was denied his right to effective assistance of counsel and due process of law as a result of the trial court's denial of his motion for a continuance. Toward the resolution of this issue we consider the following facts: Defendant was indicted for the murder of Geraldine Abbott on 8 October 1979. Due solely to defendant's own actions in removing himself from the jurisdiction, it was not until four years later that the State was prepared to bring him to trial. At a pretrial hearing on 16 September 1983, and in connection with defendant's motion for a change of venue, the trial judge, in his discretion and pursuant to N.C.G.S. § 7A-450(b), allowed defense counsel funds to hire an expert to survey the extent and effect of pretrial publicity and prejudicial bias in the Vance County community. A hearing on defendant's motion for a change of venue was scheduled for 7 November, with trial scheduled for 28 November. On 3 November counsel appeared before the court to request a continuance of the motions hearing and the trial. Accompanying the motion was a letter dated 26 October 1983 from James Luginbuhl, described as a "juristic psychologist," who, in addition to estimating the cost of the survey to be $975.00, wrote:

Given that I have a heavy teaching schedule the rest of the semester at N.C. State University, a realistic time estimate is about 2 weeks to develop the survey and find and train interviewers, 2 weeks for the interviewers to complete their task, and 2 weeks to analyze and interpret the data and prepare testimony. That would mean everything could be completed by the early part of December. Since classes at NCSU end on December 9, the week of December 12 would be especially convenient for me to testify.

You also indicated an interest in my assisting you in the selection of the jury. I have done jury selection in about a dozen capital cases in North Carolina and feel that I have been beneficial in helping attorneys select an impartial jury. In a case such as this, where the attorney is court appointed, I ask that I be paid $100 per day for jury selection.

In his order denying defendant's motion for a continuance, the trial judge concluded that there had been "an adequate amount of time for the defendant and his counsel to prepare and present pretrial motions within the time limitations earlier imposed by this Court." We agree and reject defendant's arguments to the contrary.

While we have frequently addressed the issue of a defendant's right to a speedy trial, it should not be overlooked that this right is not exclusive to criminal defendants. Our Speedy Trial Act, N.C.G.S. § 15A-701, provides in pertinent part, that in granting a continuance, the judge must find that "the ends of justice served . . . outweigh *the best interest of the public* and the defendant in a speedy trial." N.C.G.S. § 15A-701(b)(7) (emphasis added). Inasmuch as defendant's trial had been delayed for four years, we would expect the trial judge to give serious consideration to additional motions on behalf of either the defense or the State which would result in further delay. Among the considerations in the present case would be the defendant's alleged need to gather information pertaining to pretrial publicity and community prejudice in preparation for his motion for a change of venue. This information, as is most often the case and ultimately was the case here, can be adequately gleaned without the assistance of an expert. *See State v. Watson*, 310 N.C. 384, 312 S.E. 2d 448 (1984); *State v. Stokes*, 308 N.C. 634, 304 S.E. 2d 184 (1983) (upholding the denial of funds to hire experts in the field of juristic psychology). *See also State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339 (1983) (granting defendant a new trial for error in denying his motion for change of venue, without the assistance of a juristic psychologist); *State v. Richardson*, 308 N.C. 470, 302 S.E. 2d 799 (1983) (Dr. Luginbuhl presented the results of a survey in support of defendant's motion for change of venue. The motion was denied; this Court affirmed). A second consideration would be that while granting, in its discretion, defendant's motion for funds to hire a juristic psychologist, the trial court did so with an implicit

caveat: defendant was to be prepared to argue his motion for a change of venue on 7 November. In so doing, the trial judge allowed defense counsel a period of time which he considered reasonable to gather the necessary information. It was incumbent on defense counsel to meet the time limitation imposed. That the court's schedule was not convenient to Mr. Luginbuhl, defendant's proposed expert, does not render the court's schedule unreasonable.

Our review of this issue is normally limited to whether the trial court abused its discretion in denying a defendant's motion for a continuance. *State v. Mason,* 295 N.C. 584, 248 S.E. 2d 241, *cert. denied,* 440 U.S. 984 (1978). However, when a motion to continue is based on a constitutional right, the question is a reviewable question of law. *Id.; see State v. Horner,* 310 N.C. 274, 311 S.E. 2d 281 (1984). "Constitutional rights are not to be granted or withheld in the court's discretion." *State v. Farrell,* 223 N.C. 321, 327, 26 S.E. 2d 322, 325 (1943). Here it is defendant's contention that the trial court's ruling on his motion for a continuance denied him his sixth amendment right to effective assistance of counsel inasmuch as it deprived him of a fair opportunity to prepare and present his defense. Under the circumstances of this case, we cannot agree that the defendant was so deprived. Defense counsel were permitted approximately six weeks to prepare for the 7 November hearing on the motion for a change of venue. In light of the already substantial delay in bringing defendant to trial and the underlying reason for defendant's request for an additional delay, to wit: convenience of an expert afforded defendant as a discretionary matter, we find no error in the denial of the motion for a continuance.

[3] Defendant presents a forceful argument that the trial court abused its discretion in denying his motions for a change of venue. Defendant cited as support for the first motion, filed on 16 September, that Vance County is a small, largely rural county making it "particularly difficult to get a fair trial in cases such as this . . . because the jurors generally know each other and do not want to buck the community sentiment and favor conviction even though the evidence may be weak." Defense counsel also emphasized the racial nature of the case (a black man charged with murdering a white woman), and argued that in counties like Vance, "there is a long tradition . . . to convict on almost any

evidence to serve as a deterrent to blacks." Finally, defense counsel alleged that extensive pretrial publicity, including articles about the incident in the local *Henderson Daily Dispatch*, made a fair trial in Vance County impossible. The trial court denied the change of venue motion on 7 November 1983 after considering these arguments together with ten affidavits from county residents expressing the view that defendant could not receive a fair trial in Vance County.

Defendant's second motion for a change of venue was made during jury selection. This motion was based on the continuing publication of articles in the *Henderson Daily Dispatch*, one of which discussed the proposed testimony of SBI Agent Ludas that the palm print on the one dollar bill was made by the defendant. "[I]t is unreasonable to assume," stated the motion, "that the December 2, 1983 edition of the *Henderson Daily Dispatch* would not be read, despite warnings and admonitions by this Court." Defense counsel also alleged that eighty-seven of ninety-five prospective jurors had heard, read and discussed the case.

The third motion for a change of venue was filed on 1 December 1983 after the jury was selected but prior to its being impanelled. This motion included an analysis of the jury selection process and set forth the following assessment of the twelve jurors finally selected: Nine of the twelve jurors who were seated had heard, discussed and/or read about the case and the alleged incidents surrounding the crime but their prior knowledge would not prevent them from being fair and impartial. Two of the twelve jurors who were actually seated knew members of the Abbott family and one indicated that he had heard "street talk." Ten of the twelve jurors who were actually seated were at least familiar with the State's witnesses. Defense counsel reiterated that pretrial publicity and threats against the defendant's life indicated a need for a change of venue. Two additional motions were filed during trial, based primarily on publicity generated in the *Henderson Daily Dispatch*.

Defendant, in his argument to this Court, relies on our holding in *State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339, citing numerous similarities between the facts in *Jerrett* and the facts in the present case. In *Jerrett* we granted the defendant a new trial for error in the trial court's denial of his motion for a change

of venue. Our holding was based on the totality of circumstances which included a unique combination of factors: Alleghany County, where the trial took place, had a population of under 10,000 people. It was a "small, rural and closely-knit county where the entire county was, in effect, a neighborhood." *Id.* at 256, 307 S.E. 2d at 348. The victim was a well-known and respected dairy farmer. One-third of the potential jurors acknowledged familiarity with the victim or some member of his family. Ten of the twelve jurors selected and both alternate jurors had heard about the case; four knew or were familiar with the victim's family; six knew or were familiar with the State's witnesses; and the foreman had heard a relative of the victim emotionally discussing the case. A deputy sheriff, a magistrate, the sales manager of the local radio station who traveled the county extensively and at least three attorneys (one who was subsequently appointed to serve as co-counsel for the defendant, and one who appeared with the State on behalf of the victim's family), all testified that it would be difficult to find jurors who had not already formed an opinion. The jury was examined collectively. There had been extensive pretrial publicity. We also note that defendant's trial took place less than a year after the crime was committed.

By contrast, Vance County, where this defendant was tried, had, in 1983, a population of 34,000 people. Henderson alone had a population of 13,000 people. While the county as a whole might be characterized as rural, it enjoys this characterization along with the majority of counties in North Carolina. Vance County's population, however, exceeds that which might qualify it as a "neighborhood." The victim, Geraldine Abbott, was undoubtedly known and respected in her community; however, there is no evidence that she was well-known throughout Vance County. Of the ninety-five jurors questioned, only four were excused for cause because they knew the victim or her family.[1] Furthermore, of the twelve jurors who served, six had never heard or read about the case, had never discussed it, and had formed no opinions. Of the remaining six jurors, four acknowledged some pretrial exposure at the time the crime was committed four years earlier. Two acknowledged reading something about the case just prior to trial.

---

1. It appears that defendant's notoriety exceeded the victim's. Nine potential jurors were excused for cause by the State because they knew the defendant or his family and could not be impartial.

Two jurors stated that they had known one of the victim's sons who had died years before.

As we pointed out in *Jerrett*, the right of county residents to try a defendant in the county where the crime is committed is not without limitation. Nevertheless "county residents have a significant interest in seeing criminals who commit local crimes being brought to justice. For this reason, only in rare cases should a trial be held in a county different from the one in which the crime was allegedly committed." *Id.* at 254, 307 S.E. 2d at 347. It is equally true, as pointed out by Justice Mitchell in his dissenting opinion in *Jerrett*, that undue emphasis on pretrial publicity or publicity during trial "inevitably creates the 'potential for needless friction between the rights of a free press guaranteed by the First Amendment to the Constitution of the United States and the defendant's right to trial by an impartial jury guaranteed by the Sixth Amendment.'" *Id.* at 273, 307 S.E. 2d at 357-58. Indeed, defendant acknowledges in his brief that "In these technological times of electronic communications, mass media, modern transportation and the like, the problem of pretrial publicity has become a prevalent factor to be considered in providing a fair trial by an impartial, indifferent jury."

It is within the framework of these two fundamental propositions that the weakness of defendant's arguments lies. Inherent in the first proposition is the recognition that every county has an *admitted interest* in the criminal justice system as it concerns the violation of a criminal law against one of its own citizens. That interest includes the apprehension of the wrongdoer and, where there is sufficient evidence to support a conviction, the punishment of the wrongdoer. Secondly, the residents have a constitutional right under the first amendment to the dissemination of information concerning the crime and matters related thereto. Thus, particularly in our many rural counties, one would expect to encounter a sense of outrage at the brutal murder of one of its residents. Nor would it be unreasonable to expect that many residents comprising the jury venire will have heard or read about the case. It is neither surprising nor unusual in the present case that many of the prospective jurors indicated familiarity with the case or the parties to the extent that they felt they could not be impartial. Furthermore, we have consistently held that where a defendant shows only that publicity consists of factual, non-

inflammatory news stories, a trial court's denial of motion for a change of venue is proper. *See State v. Richardson*, 308 N.C. 470, 302 S.E. 2d 799. The newspaper accounts in the present case were of such a non-inflammatory nature. We therefore hold that defendant has failed to show that under the "totality of circumstances," there was a probability of prejudice such as to deny defendant due process.

Although we are tangentially concerned with prejudice, bias and interest expressed by prospective jurors during the jury selection process as related to the "totality of the circumstances," the primary focus on a motion for a change of venue has been and remains on the jurors who were ultimately selected to determine defendant's guilt or innocence. As noted earlier, six of these jurors stated that they did not know the defendant and knew nothing about the case. The remaining six indicated that they had only vague recollections about the case and each indicated in some manner that he or she had formed no opinion of defendant's guilt or innocence, presumed the defendant innocent until proven guilty, and could render a fair and impartial verdict. Throughout the trial the jury was repeatedly admonished to avoid all media accounts of the trial and to refrain from discussing the case. We hold that defendant has failed to meet his burden of showing that he was deprived of a fair and impartial jury.[2] The trial judge properly denied defendant's motion for a change of venue.

[4] Defendant's next assignment of error concerns a technical argument involving a nontestimonial identification order issued by the court during the course of the trial. We find no merit in this assignment. On 1 December 1983 the State made an oral motion requesting that the defendant submit to giving an additional palm print for identification purposes in preparation for Agent Ludas' testimony concerning the palm print found on the one dollar bill discovered at the scene of the crime. The trial court granted this motion and allowed defendant a continuance to assess the results of the procedure. Defendant reasons as follows: The defendant was then in custody. The "judge's Order requiring

---

2. As required in order to meet his burden of showing actual prejudice, defendant exhausted his peremptory challenges. Juror Ball was seated over defendant's objection. Juror Ball had known the victim's deceased son in the 1950's. He stated unequivocally that he could be fair and impartial.

him to submit to additional fingerprinting was tantamount to an Order pursuant to G.S. 15A-274" (requiring suspect to submit to certain nontestimonial identification procedures). This Court in *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977) held that N.C.G.S. § 15A-271 did not apply to a defendant in custody. Therefore, concludes defendant, the trial court was without authority to issue the order, and the results of the procedure should have been suppressed.

In short answer to defendant's argument we point out that although N.C.G.S. § 15A-271 does not apply to an in-custody defendant, it does not follow that a trial judge is without authority to issue a nontestimonial identification order where the defendant is in custody. An order was not required. *See State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833. The fact that the State chose to comply with the more restrictive procedures outlined in N.C.G.S. § 15A-271 in obtaining the order worked to defendant's advantage.

Nor do we agree with defendant's further argument that, although it might have acted within its legal authority, the trial court abused its discretion in ordering defendant to submit to an additional print. Defendant does not specify, nor can we conceive how defendant was prejudiced by the taking of his palm print during trial. Defendant knew well in advance of trial that Agent Ludas was expected to testify that the print found at the crime scene matched that of the defendant.[3] The procedure took less than five minutes. The trial court granted defense counsel's request for funds to be paid, in advance, to hire an independent fingerprint expert to analyze the results and the case was continued until the following Monday in order to permit counsel to reevaluate its case in light of the results. In short, both the trial judge and the prosecutor accommodated defense counsel well beyond that required.

[5] Defendant next contends that the trial court erred in denying his motion for a mistrial based on the admission into evidence of the victim's pocketbook, which evidence was later excluded.

---

3. Law enforcement authorities had access to defendant's palm prints as a result of an earlier felony conviction.

The record discloses that during direct examination of Henderson Police Officer Grissom, the witness was asked to identify numerous exhibits related to the crime. Among these exhibits was a brown floral pocketbook which was found in an abandoned house located on the same street as that on which the defendant lived. Officer Grissom also identified cards and other personal items belonging to Geraldine and Susie Abbott which were found inside the pocketbook. The State moved that the exhibits be received into evidence. The trial judge overruled defendant's objection and admitted the exhibits into evidence. However, following a fifteen minute recess during which defense counsel argued that the evidence was irrelevant, the trial judge reversed his prior ruling. The jury was instructed that the evidence was not to be considered. Defendant contends that the evidence was "so highly prejudicial that its effect cannot be erased from the minds of the jurors," and "error in its admission is not cured by its withdrawal and instruction of the Court not to consider it."

We agree that the evidence was properly excluded. No foundation was laid for its admission. The pocketbook was discovered approximately three weeks after the murder and there was no evidence to connect it to the defendant. For these same reasons, we cannot agree that defendant was prejudiced by the admission and subsequent withdrawal of the exhibits from evidence. The very remoteness which characterized this evidence, taken together with the trial judge's instruction to the jury to disregard it, leads us to the conclusion that if any, the probable influence of the evidence upon the minds of the jury in reaching a verdict was slight. *See State v. Rowland,* 263 N.C. 353, 139 S.E. 2d 661 (1964); *State v. Strickland,* 229 N.C. 201, 49 S.E. 2d 469 (1948). The assignment of error is overruled.

[6] Defendant contended at trial that there was insufficient evidence of premeditation and deliberation to support the submission of the case to the jury on a charge of first-degree murder. Although he assigns as error the denial of his motion for nonsuit, defendant makes no argument in this regard to us on appeal. Due to the serious nature of this case, we have nevertheless carefully reviewed the record and transcript and conclude that there was plenary evidence to support a conviction of first-degree murder. The viciousness and brutality of the attack upon this seventy-two year old victim was unprecedented in the experience of the physi-

cian conducting the autopsy. The numerous wounds, including defensive incisional wounds to the victim's hands and arms, her broken ribs, the evidence of strangulation and the evidence of sexual assault indicate that the victim underwent extreme physical pain and unspeakable psychological anguish prior to her death. This evidence is sufficient to support a theory that the murder was committed with premeditation and deliberation. *See State v. Fountain*, 282 N.C. 58, 191 S.E. 2d 674 (1972); *State v. Duboise*, 279 N.C. 73, 181 S.E. 2d 393 (1971). This assignment of error is overruled.

[7] Defendant raises one assignment of error concerning the sentencing phase of his trial. He argues that the trial judge erred in submitting two aggravating factors based on the same evidence, to wit: an attempt to commit rape on Susie Abbott. We agree. However, the error was committed without prejudice to the defendant. The two aggravating factors at issue, as submitted, were: (1) The murder was committed while the defendant was engaged in the commission of a crime of first-degree burglary *or an attempt to commit the crime of first-degree rape.* (2) The murder was part of a course of conduct in which the defendant engaged which included the commission by the defendant of other crimes of violence against other persons. In this regard, the trial judge instructed the jury that "[t]here is evidence from which you may find the commission of crimes of assault with a deadly weapon with intent to kill inflicting serious injury or the lesser included offense of assault with a deadly weapon inflicting serious injury, and as well, *the crime of attempted rape.*"

In addition to relying on the evidence presented at the guilt phase, the State offered the testimony of Susie Abbott during the sentencing hearing. This evidence, taken together, was sufficient to support these two aggravating factors without the necessity of relying on the crime of attempted rape. In fact, of the three crimes submitted to support these aggravating factors, *i.e.*, first-degree burglary, assault, and attempted rape, evidence of the attempted rape was unquestionably the weakest. Apart from the fact that Susie Abbott was found naked when witnesses arrived at the scene, evidence of the attempted rape depended on the testimony of Susie Abbott whose credibility was possibly reduced because of her handicap. On the other hand, there was plenary evidence to support the submission of the aggravating factor that

the murder was committed while the defendant was engaged in the commission of the crime of first-degree burglary. Without undue reliance on Susie Abbott's testimony, the jury had before it evidence that an intruder entered the home of Geraldine Abbott during the nighttime hours of 29 September with the intent to commit larceny or intent to commit rape.[4]

With respect to the second aggravating factor, that the murder was part of a course of conduct involving other crimes of violence, there was compelling evidence of the crime of assault with a deadly weapon inflicting serious bodily injury committed against Susie Abbott. During the guilt phase, numerous witnesses testified that Susie Abbott was discovered, close to death, bleeding from knife wounds inflicted over much of her body. Her throat had been cut and she displayed the scar to the jury. This evidence alone was more than sufficient to support the jury's finding that the murder was part of a course of conduct involving other crimes of violence. Thus, although submission of the crime of attempted rape was duplicative, it was also unnecessary, superfluous, and, as a result, harmless.

Where, as here, there is additional independent evidence to support both aggravating factors, thereby rendering the duplicative evidence unnecessary, the case for harmless error is significantly stronger than in those cases where this issue has previously been considered. In *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979), the submission of two aggravating factors based on the same evidence in effect resulted in the necessity for entirely removing one of those factors from the jury's consideration. In assessing whether the erroneous submission in a capital

---

4. The physical evidence, as corroborated by Susie Abbott's testimony, would support these theories: With respect to the larceny, two one dollar bills were found loose on the floor. Susie Abbott testified that the intruder rummaged through their pocketbooks. The victims' pocketbooks were missing. Furthermore, in the absence of evidence of other intent or explanation for a breaking or entering in the nighttime, it can be inferred that the intent is to commit a larceny. *See State v. Sweezy*, 291 N.C. 366, 230 S.E. 2d 524 (1976); *State v. Hedrick*, 289 N.C. 232, 221 S.E. 2d 350 (1976). In the present case there was also evidence of an intent to commit rape based on evidence that Geraldine Abbott, the murder victim, was sexually assaulted and on evidence of the sexual assault on Susie Abbott. This would not preclude the trial court's submission or the jury's consideration of the substantive offense of attempted rape as a separate felony, in addition to the first-degree burglary.

case of an aggravating factor was harmless error, this Court in *Goodman* considered whether there was a reasonable possibility that the evidence complained of might have contributed to the imposition of the death penalty. *See State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, --- U.S. ---, 77 L.Ed. 2d 1398, *reh. denied*, 77 L.Ed. 2d 1456 (1983) (finding no prejudicial error in the erroneous submission of an aggravating factor). *See also Zant v. Stephens*, --- U.S. ---, 77 L.Ed. 2d 235 (1983). In *Goodman* we found the error to be prejudicial primarily due to weaknesses in the State's primary evidence. In the present case, no such weakness exists. More important, however, the error complained of here did not result in the erroneous *submission* of either aggravating factor. Both were properly submitted based on other independent evidence. The question before us is whether the jury would have *found* both aggravating factors in the absence of the duplicative evidence. As noted earlier, there was ample evidence of first-degree burglary of the Abbott residence, and assault with a deadly weapon against Susie Abbott to support the jury's findings. Finally, in light of the vicious brutality of these crimes and the absence of any significant factors in mitigation, there could be no reasonable possibility that consideration of the crime of attempted rape under one, the other, *or both* aggravating factors might have contributed to the imposition of the death penalty in this case. The assignment of error is overruled.

[8] Neither the defendant nor the State presents us with an argument on proportionality. Pursuant to our statutory duty we have carefully reviewed the transcript, record on appeal, and other pertinent material and find nothing which would indicate that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our review of cases in the proportionality "pool" provides us with no reason to vacate this death sentence.

　　The victim, a seventy-two year old woman, was brutalized in her home. She was strangled, stabbed, and sexually assaulted. Defendant sexually assaulted her mentally retarded daughter and, in addition to numerous stab wounds, defendant inflicted a nearly fatal cut to this second victim's throat. In fact, the knife wounds were inflicted with such force that the murder weapons, a serrated steak knife and a pocketknife, were both broken when discovered at the scene of the crime. Defendant offered little in

mitigation of this outrageous offense. Considering both the crime and the defendant, the circumstances of this case fall well within the class of first-degree murders in which we have previously upheld the penalty of death. *See State v. Craig*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 247 (1983); *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 177, *reh. denied*, --- U.S. ---, 78 L.Ed. 2d 704 (1983); *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 173 (1983); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080 (1982); *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, 459 U.S. 1056 (1982); and *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038 (1982). We do not here discuss these cases further.

The facts of each case are fully set out in the opinions. We have likewise reviewed all cases in the pool in which life sentences have been imposed. We find none that are applicable. We deem it appropriate, however, to reiterate the legal principles which have guided us in reaching our result today.

[9] Although the United States Constitution does not require a comparative proportionality review, *Pulley v. Harris*, --- U.S. ---, 79 L.Ed. 2d 29 (1984), that requirement is statutorily mandated. N.C.G.S. § 15A-2000(b)(2). In *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335 this Court discussed at some length its approach in conducting a proportionality review. We rejected any approach that would include "mathematical or statistical models involving multiple regression analysis or other scientific techniques, currently in vogue among social scientists" . . . with " 'seductive appeal of science and mathematics.' " *Id.* at 80, 301 S.E. 2d at 355. We concluded that "[t]he factors to be considered and their relevancy during proportionality review in a given capital case *are not readily subject to complete enumeration and definition.* Those factors will be as numerous and as varied as the cases coming before us on appeal." *Id.* (Emphasis added.) We stated in *Williams*, and emphasize now, that we believe our approach to proportionality review achieves its goal of " 'substantially eliminat[ing] the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *Id.* at 82, 301 S.E. 2d at 356.

[10]　Thus, although the cases in the pool offer guidance in determining whether a sentence of death in a particular case is excessive or disproportionate, ultimately each case must rest on its own unique facts. An analysis which involves further inquiry into the endless combinations, variations, permutations, and nuances that an in-depth review of every case in the pool would yield would be a fruitless endeavor. We are satisfied that the facts of this case fully support the jury's decision to recommend a sentence of death.

No error.

Justice VAUGHN did not participate in the consideration or decision of this case.