STATE OF NORTH CAROLINA v. RUSSELL HOLDEN, JR.

No. 650A85

(Filed 2 December 1987)

### 1. Criminal Law § 135.3; Jury § 7.11— death qualification of jury

Death qualification of the jury in a first degree murder case did not deny defendant his right to a jury made up of a cross-section of the community or result in a conviction-prone jury in violation of the U.S. and N.C. Constitutions.

### 2. Criminal Law § 135.3; Jury § 7.11— first degree murder—separate guilt and sentencing juries not required

The trial court properly denied defendant's motion in a first degree murder case for two separate jury trials to decide the issues of guilt or innocence and punishment.

### 3. Jury § 6— denial of motion to sequester prospective jurors

The trial court did not abuse its discretion in denying defendant's motion to sequester the prospective jurors during the voir dire proceedings of a first degree murder case on the ground that questioning prospective jurors in a group setting prevents them from expressing their true feelings. N.C.G.S. § 15A-1214(j).

### 4. Jury § 6.3— voir dire—ability to return guilty verdict—statements by prosecutor

The prosecutor's statements to prospective jurors concerning the unanimity of the verdict, including a statement that "if there is one person on the jury who could not return a verdict of guilty then the State . . . could not receive a fair trial," were proper for the purpose of eliciting information relevant to provisions of N.C.G.S. § 15A-122(8) permitting a challenge for cause to a juror who, as a matter of conscience, would be unable to render a verdict in accordance with the law of North Carolina.

### 5. Jury § 7.14— peremptory challenge of black jurors—no unlawful discrimination

The trial court did not err in allowing the prosecution to challenge black potential jurors peremptorily where the State peremptorily challenged only four of twenty black potential jurors; defendant does not contend and the record does not show that the State based its peremptory challenges on racially discriminatory criteria; and defendant was tried by a jury of seven whites and five blacks, with one white alternate and one black alternate.

### 6. Homicide § 12.1; Indictment and Warrant § 13— premeditation and deliberation or felony murder—election not required

The trial court did not err in denying defendant's pretrial motion to require the State to elect whether it intended to base its first degree murder case on premeditation and deliberation or the felony murder rule.

7. **Criminal Law § 98.2— refusal to sequester witnesses**

    The trial court did not err in the denial of defendant's motion to sequester the State's witnesses on the ground that the presence of an extensive number of witnesses has an unduly persuasive effect on the jurors and causes the witnesses to substitute the recollection of the mass for their individual recollections. N.C.G.S. § 15A-1225.

8. **Constitutional Law § 30; Bills of Discovery § 6— list of State's witnesses not discoverable**

    The trial court properly denied defendant's pretrial discovery motion to compel the State to give him a list of the witnesses the State intended to call.

9. **Constitutional Law § 31— refusal to provide defendant with ballistics expert and investigator**

    The trial court in a murder and attempted rape case did not err in the denial of defendant's motion that the State provide him with a ballistics expert and funds to hire a private investigator where defendant offered the court only a mere hope or suspicion that favorable evidence was available. N.C.G.S. §§ 7A-450(b) and 454.

10. **Criminal Law § 75.4— voluntariness of confession**

    The trial court properly denied defendant's motion to suppress a statement he made to an SBI agent where the trial court conducted a voir dire hearing and found upon supporting evidence that defendant knowingly, voluntarily and understandingly waived his right to remain silent and to have an attorney present before making the statement.

11. **Searches and Seizures § 14— issuance of warrant—consent to search**

    The trial court did not err in denying defendant's motion to suppress evidence seized from defendant's home and car after the issuance of a search warrant where the trial court found upon supporting evidence that defendant voluntarily consented to a search of his home and car and signed consent to search forms before the warrant was issued.

12. **Homicide § 20.1— photographs of victim's body**

    The trial court did not err in denying defendant's motion to limit the number of photographs of a murder victim the State could introduce where the seven photographs presented by the State showing the body and the crime scene were not inflammatory or repetitive.

13. **Criminal Law § 73.2— information received by officer not inadmissible hearsay**

    An officer's testimony that he received information that the victim had been shot was not inadmissible hearsay where the statement was not offered to prove the truth of the matter asserted but to explain why the officer procured a warrant to search defendant's home for a gun.

14. **Criminal Law § 73.2— corroborative evidence not inadmissible hearsay**

    An SBI agent's testimony that a friend of defendant's wife told him that he observed defendant's wife come out of the house with something that appeared to be a gun was not inadmissible hearsay where the statement was offered to corroborate the previous testimony of the friend of defendant's wife.

State v. Holden

**15. Criminal Law § 80— firearms form—business records exception to hearsay rule**

A federal firearms form which was filled out by defendant and a salesman at the time defendant bought the murder weapon was admissible under the business records exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(6).

**16. Criminal Law § 87— testimony not improper assumptions**

Witnesses in a homicide case did not improperly testify to assumptions when one witness explained a slang term, a second witness described what he remembered seeing at the crime scene and explained why he and other people present thought the victim died from a cut on her throat, and a forensic serologist and an SBI fingerprint examiner explained some of the mechanics of their fields of expertise.

**17. Homicide § 21.6; Rape and Allied Offenses § 5— first degree murder—attempted first degree rape—sufficiency of evidence**

The evidence was sufficient to support jury verdicts finding defendant guilty of first degree murder and attempted first degree rape.

**18. Criminal Law § 102.6— jury argument—defendant's directions to wife—reasonable inference**

The prosecutor's jury argument in a murder and attempted rape case that "his wife came over to see him in jail and don't you know what he told her is to get that gun and hide that gun" was a reasonable inference from evidence that defendant's gun was present at his home when it was searched on 16 March but was no longer there when officers returned on 18 March, defendant's wife visited him in jail on 17 March, and a witness observed defendant's wife come out of the house with something that appeared to be a gun.

**19. Criminal Law § 102.6— jury argument—guilty people walking streets**

Statements by the prosecutor in his jury argument to the effect that there are guilty people walking the streets of this country every day because the government cannot collect enough evidence to try them for crimes and for the jury to find them guilty were not improper when considered in context.

**20. Criminal Law § 135.4— death penalty statute—constitutionality**

The statute authorizing the death penalty, N.C.G.S. § 15A-2000, is not unconstitutional because the jury has discretion whether to impose it.

**21. Jury § 7.11; Criminal Law § 135.3— capital punishment beliefs—excusal of juror after guilt phase**

The trial court did not err in excusing a juror for cause and substituting an alternate juror after the completion of the guilt phase of a first degree murder case and prior to the sentencing phase where the juror stated during the *voir dire* prior to trial that she could vote for the death penalty but the trial court learned after the guilt phase was completed that she had changed her mind and could not vote for the death penalty under any circumstances. N.C.G.S. § 15A-2000(a)(2).

22. **Homicide § 12; Indictment and Warrant § 13.1— first degree murder—death penalty—aggravating factors relied on—bill of particulars not required**

The trial court did not err in the denial of defendant's motion to require the State to file a bill of particulars reciting the aggravating factors it intended to rely on at the punishment phase.

23. **Criminal Law § 135.6— capital case—sentencing phase—evidence of prior conviction**

Evidence of defendant's prior conviction was not improperly admitted during the sentencing phase of a first degree murder case to show defendant's bad character in violation of N.C.G.S. § 8C-1, Rule 404(a) but was properly admitted to prove the aggravating circumstance that defendant had previously been convicted of a felony involving the use or threat of violence to the person.

24. **Criminal Law § 135.6— capital case—sentencing phase—evidence of prior criminal activity**

Testimony by five witnesses concerning prior criminal activity by defendant (two rapes and three assaults) was not improperly admitted in a sentencing hearing for first degree murder to show a common scheme or plan in violation of N.C.G.S. § 8C-1, Rule 404(b) but was properly admitted to rebut evidence offered by defendant to prove the mitigating factor that he had no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1).

25. **Criminal Law § 135.4— capital case—sentencing phase—jury argument—aggravating rather than mitigating factor—absence of prejudice**

Defendant was not prejudiced by the prosecutor's jury argument in a murder and attempted rape case that evidence that defendant gave CPR to a victim while working with a rescue squad was really an aggravating rather than a mitigating factor because defendant used his position as a member of the rescue squad to commit a rape where any possible confusion about aggravating factors was eliminated by the trial judge's instructions.

26. **Criminal Law § 102.12— jury argument for death penalty**

The prosecutor's jury argument that "he should not be out there on the street and given the opportunity to commit this crime again" and that "the only way you can be sure . . . is if you give him the death penalty" was not improper.

27. **Criminal Law § 102.6— statements that defendant will rape again**

The prosecutor's jury arguments in a murder and rape case that "if he gets out there he's going to do it again" and "How many more women are we going to see this man rape before we say enough is enough?" were not so grossly improper as to require the trial judge to correct the arguments *ex mero motu.*

28. **Criminal Law § 102.6— jury argument—statements about victim**

The prosecutor's jury arguments in a murder and rape case that "The victim didn't have an opportunity to have [defendant's attorneys] represent her" on the date of the crimes and that "she cries out from the grave for justice" were not improper.

29. **Criminal Law § 102.6— jury argument—religion gained by defendants**

The prosecutor's jury argument that "I wish I had a quarter for every defendant that we've ever gotten up here that says after he got in jail he

found the Lord and now he's got religion," if marginally improper, was not so grossly improper as to require correction *ex mero motu.*

**30. Criminal Law § 135.9— capital case—mitigating factors—no right to peremptory instructions**

The trial court did not err in refusing to give peremptory instructions on the fifteen mitigating factors placed before the jury where evidence was presented from which the jury could find that three statutory factors were not true; the jury could find that defendant's age at the time of the crime, thirty, was not a mitigating factor; evidence was presented from which the jury could find that six nonstatutory factors were either not true or were of no mitigating value; and the jury found the remaining five nonstatutory factors.

**31. Criminal Law § 135.7— capital case—life sentence if jury can't agree on punishment—refusal to instruct**

The trial court in a first degree murder case properly refused to instruct the jury that the court would impose a life sentence if the jury could not unanimously agree on a recommendation of punishment within a reasonable time.

**32. Criminal Law § 135.9— capital case—mitigating circumstances—burden of proof**

Defendant has the burden of proving the existence of any mitigating circumstance by a preponderance of the evidence, and the trial court properly refused to instruct the jury that the burden was on the State to prove beyond a reasonable doubt that a mitigating circumstance does not exist.

**33. Criminal Law § 135.9— mitigating circumstances—unanimity of jury**

A jury must unanimously find that a mitigating circumstance exists before it may be considered for the purpose of sentencing, and the trial court properly refused to instruct the jury that "no single juror is precluded from considering anything in mitigation in the ultimate balancing process, even if that mitigating factor was not considered or agreed upon by all 12 of you unanimously."

**34. Criminal Law § 135.9— capital case—low mental development—mitigating circumstance entitled to great weight—refusal of court to instruct**

The trial court properly refused to give defendant's requested instruction that "Evidence that the defendant's mental or emotional development was significantly below that of persons of his chronological age is a mitigating circumstance entitled to great weight" since (1) although a defendant's mental or emotional development is a relevant part of the analysis of the mitigating factor of age, the relationship between defendant's mental and emotional development and that of persons of his chronological age is not the determinative factor, and the trial court properly instructed that "age" is not restricted to chronological age but includes defendant's mental and physical development, his experience, and his criminal tendencies, and (2) the jury has the duty to decide how much weight to give to each aggravating and mitigating circumstance.

State v. Holden

**35. Criminal Law § 135.7— capital case—unanimously find beyond reasonable doubt that death penalty appropriate—refusal to instruct**

The trial court properly refused to give defendant's requested instruction that "even if you find that the aggravating circumstance is sufficiently substantial to call for the death penalty in light of the mitigating circumstances, you must unanimously and beyond a reasonable doubt find that death is the appropriate punishment in this case for this defendant" since this instruction incorrectly implies that the jury could find that the aggravating circumstances found are sufficiently substantial to call for the imposition of the death penalty, find that the mitigating circumstances do not outweigh the aggravating circumstances, and then decide not to impose the death penalty. N.C.G.S. § 15A-2000(c).

**36. Criminal Law § 135.7— capital case—life imprisonment for typical and normal murders—refusal to instruct**

The trial court properly refused to give defendant's requested instruction to the effect that the appropriate sentence for the "typical" and "normal" cases of premeditated and deliberated murder is life imprisonment.

**37. Criminal Law § 135.8— capital case—aggravating circumstance—previous conviction—plea of no contest followed by sentence**

A plea of no contest followed by a final judgment imposing a sentence is a conviction within the meaning of the previous conviction of a felony involving the use or threat of violence to the person aggravating circumstance set forth in N.C.G.S. § 15A-2000(e).

**38. Criminal Law § 135.8— capital case—aggravating circumstance—preventing lawful arrest**

Statements made by defendant were sufficient evidence for the jury to infer that one of the purposes motivating a murder was defendant's desire to avoid subsequent detection and apprehension for his rape of the victim so that the trial court properly submitted the aggravating circumstance as to whether the murder was committed for the purpose of avoiding or preventing a lawful arrest.

**39. Criminal Law § 102.12— capital case—jury argument—execution procedure**

The trial court in a capital case properly sustained the State's objection to defense counsel's jury argument describing the execution procedure defendant could encounter if he were sentenced to death since such argument was not based on the evidence presented.

**40. Criminal Law § 102.12— capital case—jury argument—asking individual jurors to spare defendant's life**

The trial court in a capital case properly sustained the State's objection to defense counsel's jury argument asking each juror individually to spare defendant's life.

**41. Criminal Law § 135.10— killing after sexual assault—death penalty not disproportionate**

A sentence of death imposed on a defendant who killed his victim after sexually assaulting her was not excessive or disproportionate to the penalty imposed in similar cases considering the crime and the defendant.

Chief Justice EXUM concurring.

Justice FRYE dissenting as to sentence.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of death entered by *Stevens, Judge*, at the 26 August 1986 Session of Superior Court, DUPLIN County, where defendant was convicted of one count of first-degree murder and one count of attempted first-degree rape. Defendant's motion to bypass the Court of Appeals as to the rape conviction was allowed. Heard in the Supreme Court 8 June 1987.

Defendant was tried for first-degree murder and first-degree rape. The State's evidence tended to show the following: At about 3:00 a.m. on 16 March 1985, defendant, the victim and a number of other people were leaving a certain nightclub. Mr. Levon Hicks, Mr. Johnny Barden, and the victim left with the defendant in his automobile. Defendant took Mr. Barden to his house. Soon thereafter, defendant stopped the car, and tied the victim's feet with a pair of suspenders that were in the car. At this time, the victim was very drunk, but conscious. Defendant then drove down a dirt road. He told Mr. Hicks he "was going to get some." Defendant parked the car again, got in the back seat with the victim, and began to feel her breasts. He unzipped her pants, then zipped them back up. He said he "would get him some, but somebody might hear her holler," so he got back in the front seat and drove off. He told Mr. Hicks, "[I]f you want some you better get it." Mr. Hicks replied that he "didn't want to mess with her." Defendant then took Mr. Hicks to his house on Rural Road 1106. When Mr. Hicks got out of the car, defendant said that "he was going to get some meat, but if he got it, he'[d] probably have to kill her so she wouldn't tell nobody." Mr. Hicks never saw the victim alive again.

The victim's body was found at 1:00 p.m. that day, off a dirt path running from Rural Road 1106. Her throat had a six-inch cut on it. She was partially undressed. Her right shoe was off, lying near her, and a red suspender was found beneath it.

When Mr. Hicks learned that the victim was dead, he went to the police and told them that defendant was the last person he had seen her with. The police searched defendant's home. They found a .25 caliber pistol. They wrote down the serial number, but

did not seize it because the search warrant did not authorize them to seize guns.

Two days later an autopsy revealed that the victim had been shot in the neck as well as cut, and that the gunshot wound was the cause of her death. The pistol was recovered from defendant's father on 29 March. An owner of a pawnshop produced a record indicating that defendant had bought the pistol.

A stained pair of pants had also been found at defendant's house on 16 March, in the washing machine. A forensic serologist testified that the stains were "probably" bloodstains. An SBI fiber expert testified that the suspender found under the victim's shoe and a suspender found in defendant's car were in all respects the same. He also testified that fibers found on the victim's clothing were in all respects the same as the fiber of the carpet in defendant's car. On 19 March, police returned to where the body was found and discovered a fired cartridge case. An SBI firearms expert testified that the cartridge case was fired in defendant's pistol.

The jury found defendant guilty of first-degree murder and attempted first-degree rape, and recommended that he be sentenced to death. The court sentenced defendant to death for the first-degree murder and twenty years imprisonment for the attempted first-degree rape.

*Lacy H. Thornburg, Attorney General, by William N. Farrell, Jr., Special Deputy Attorney General, for the State.*

*Reginald Kenan, for defendant appellant.*

WEBB, Justice.

[1] Defendant brings forth three assignments of error relating to the "death qualification" of the jury. He assigns error to the trial court's denial of his motion to prohibit the district attorney from challenging for cause jurors opposed to the death sentence, and the trial court's denial of his motion to seat jurors without regard to their opposition to the death penalty. Defendant further assigns error to the trial court's allowing the district attorney to ask jurors if they would be unable to vote for a sentence of death.

Defendant argues that the trial court, by "death qualifying" the jury in this manner, excluded a certain segment of society,

and thus denied defendant his right to be tried by a jury made up of a cross-section of the community. Defendant also argues that "death qualification" may have caused the jurors to be biased in favor of the prosecution's presentation.

In *Lockhart v. McCree*, 476 U.S. ---, 90 L.Ed. 2d 137 (1986), the United States Supreme Court held that the federal Constitution does not prohibit "death qualification," or removal for cause, prior to the guilt-innocence determination phase of a capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would substantially impair the performance of their duties as jurors at the sentencing phase of the trial. In its opinion, the United States Supreme Court rejected both defendant's argument that "death qualification" denies a defendant his right to a jury made up of a cross-section of the community, and also defendant's argument that "death qualification" results in a conviction-prone jury. Defendant's arguments were also rejected by this Court in *State v. King*, 316 N.C. 78, 340 S.E. 2d 71 (1986). In *State v. Barts*, 316 N.C. 666, 343 S.E. 2d 828 (1986), we specifically held that "death qualification" does not violate the North Carolina Constitution. Defendant has given us no reason to disregard or overrule our decisions in *King* and *Barts*.

[2] Defendant next assigns error to the trial court's denial of his motion for two separate jury trials, one to decide the issue of guilt or innocence and another to decide the issue of punishment. Under N.C.G.S. § 15A-2000, it is intended that the same jury should hear both phases of the trial unless the original jury is unable to reconvene. N.C.G.S. § 15A-2000(a)(2); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398 (1983). We are bound by *Taylor* to overrule this assignment of error.

[3] Defendant next assigns error to the trial court's denial of his motion to sequester the prospective jurors during the voir dire proceedings. Defendant argues that questioning the prospective jurors in a group setting prevented them from expressing their true feelings.

N.C.G.S. § 15A-1214(j) provides: "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after se-

lection." Whether to sequester the prospective jurors during the voir dire rests within the sound discretion of the trial judge, and his ruling will not be disturbed absent an abuse of discretion. *State v. Wilson,* 313 N.C. 516, 330 S.E. 2d 450 (1985). In the present case, defendant has made no showing that the trial judge abused his discretion. His argument that a group setting inhibits candor has been rejected before by this Court as mere speculation. *See State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979).

[4] Defendant next contends the trial court erred by allowing the district attorney to misstate the law several times during the voir dire of the jury. Defendant argues that four specific statements made by the district attorney implied that the State would not receive a fair trial, and the judge could not accept the jury's verdict, unless all twelve jurors agreed that defendant was guilty.

We disagree. When read in context, the four statements were not at all improper. Each one of the four statements was made to a separate group of prospective jurors, and all four were substantially the same. Here is one of the statements, quoted in context:

His Honor at the appropriate time will instruct you that any verdict that the jury returns has to be unanimous and that is all 12 of you either have to vote guilty or not guilty as to each charge before His Honor can accept your verdict. No verdict can be by majority vote, it has to be unanimous. From time to time we see people who come to be on the jury who have either religious or moral beliefs that would prevent them from serving on the jury and returning a verdict of guilty. That is some people believe that it's wrong to serve on a jury and determine the innocence or guilt of another person. Obviously, if there is one person on the jury who could not return a verdict of guilty then the State . . . could not receive a fair trial since the verdict of the jury could never reach a verdict of guilty since one person could not ever return a verdict of guilty. So, does any of the six of you have . . . such a religious or moral belief in deciding the innocence or guilt of another person, please raise your hand.

N.C.G.S. § 15A-1212 provides, in pertinent part, "a challenge for cause to an individual juror may be made by any party on the ground that the juror . . . (8) As a matter of conscience, regard-

less of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." The district attorney's statements, when read in context, were clearly calculated to elicit information relevant to this provision, and were not at all improper.

[5] Defendant next contends the trial court erred in allowing the prosecution to challenge potential black jurors peremptorily, thereby denying defendant the right to be tried by his black peers.

Neither federal nor North Carolina law gives defendant the right to be tried by a jury composed in whole or in part of persons of his own race. *Batson v. Kentucky*, 476 U.S. ---, 90 L.Ed. 2d 69 (1986); *State v. Elkerson*, 304 N.C. 658, 285 S.E. 2d 784 (1982). A defendant has only the right to be tried by a jury the composition of which was not decided according to racially discriminatory criteria; the State may not challenge a potential juror solely on account of race. *Batson*, 476 U.S. ---, 90 L.Ed. 2d 69.

Defendant in the present case does not contend, nor does the record reveal, that the State based its peremptory challenges on racially discriminatory criteria. Defendant was tried by a jury of seven whites and five blacks, with one white alternate and one black alternate. Of the twenty black potential jurors and alternates, ten were excused for cause. The State peremptorily challenged only four of the remaining ten. Defendant's assignment of error is without merit.

[6] Defendant next contends the trial court erred in denying his pretrial motion to require the State to make an election whether it intended to base its first-degree murder case on premeditation and deliberation or the felony murder rule.

The State is not required to elect between legal theories in a murder prosecution prior to trial. Where the factual basis for the prosecution is sufficiently pleaded, a defendant must be prepared to defend against any and all legal theories which these facts may support. *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981). This assignment of error is overruled.

[7] Defendant next assigns error to the trial court's denial of his motion to sequester the State's witnesses. Defendant argues that the presence of an extensive number of witnesses had an unduly

persuasive effect on the jurors, and also caused the witnesses to substitute the "recollection of the mass" for their "individual recollection." A motion to sequester witnesses is addressed to the discretion of the trial judge, and is not reviewable on appeal absent a showing of abuse of discretion. N.C.G.S. § 15A-1225; *State v. Stanley*, 310 N.C. 353, 312 S.E. 2d 482 (1984). Defendant has not shown, nor does the record reveal, any abuse of discretion in the trial judge's ruling.

[8] Defendant next assigns error to the trial court's denial of his pretrial discovery motion to compel the State to give him a list of the witnesses the State intended to call. We are bound by *State v. Alston*, 307 N.C. 321, 298 S.E. 2d 631 (1983) to overrule this assignment of error.

[9] Defendant next assigns error to the trial court's denial of his motion that the State provide him with an expert to examine and testify regarding the weapon. Defendant also assigns error to the trial court's denial of his request for funds to hire an investigator to help in the preparation of defendant's case.

N.C.G.S. §§ 7A-450(b) and 454 require that expert assistance or private investigators be provided to an indigent defendant only upon a showing by the defendant that there is a reasonable likelihood that it will materially assist him in the preparation of his defense or that without such help it is probable that the defendant will not receive a fair trial. Neither the State nor the federal constitution requires more. *State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981). Mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided. *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976). The decision whether to provide a defendant with either an expert witness or an investigator is addressed to the discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion. *State v. Stokes*, 308 N.C. 634, 304 S.E. 2d 184 (1983); *State v. Parton*, 303 N.C. 55, 277 S.E. 2d 410 (1981).

In the present case, when defense counsel made the motion for a ballistics expert, he argued only that "experts have different opinions." When he made the motion for funds to hire an investigator, he argued only that an investigator would "get out there and beat the bushes and give [defendant] the pertinent kind of defense the defendant deserves." In these arguments, defend-

ant offered the court only "mere hope or suspicion that favorable evidence was available." Thus, we cannot find that the trial judge abused his discretion in denying defendant's motions.

[10] Defendant next assigns error to the trial court's denial of his motion to suppress a statement he gave to SBI agent John Payne on 16 March 1985. Defendant argues that the statement was obtained in violation of his constitutional rights in that it was not knowingly, intelligently and voluntarily given, and defendant did not knowingly, intelligently and voluntarily waive his right to a lawyer.

The trial court held a voir dire hearing on defendant's motion to suppress. John Payne, an agent with the State Bureau of Investigation, testified that he fully advised the defendant of his constitutional right to an attorney and his right to remain silent. Mr. Payne testified further that the defendant did not appear to be under the influence of any intoxicating beverage or drug and appeared to be able to understand what Mr. Payne was saying to him. Mr. Payne said the defendant told him he would make a statement and signed a waiver of rights form. The defendant did not offer any evidence to contradict the testimony of Mr. Payne. The court made findings of fact consistent with the testimony of Mr. Payne and held that the defendant "freely, knowingly, voluntarily, and understandingly" waived his right to remain silent and to have an attorney before making a statement. The court overruled the motion to suppress.

Findings of fact made by a trial judge following a voir dire hearing on the voluntariness of a confession are conclusive on appeal if the findings are supported by competent evidence in the record. *State v. Jackson*, 308 N.C. 549, 304 S.E. 2d 134 (1983). The trial judge's findings of fact in the present case are amply supported by evidence in the record. These findings of fact in turn support the trial judge's conclusion of law that defendant's statement was not obtained in violation of his constitutional rights, and his order that defendant's motion to suppress be denied. There was no error here.

[11] Defendant next contends the trial court erred in denying his motion to suppress evidence seized pursuant to a search warrant. Defendant argues that the search warrant was "based upon hearsay information from a person who had never been used before

nor did the deputy have any knowledge or facts that the person was credible or reliable."

At the same voir dire hearing the court considered defendant's motion to suppress his statement, it also considered this motion to suppress evidence. Evidence at the hearing tended to show: a warrant was issued on 16 March 1985, the day of the murder. It authorized the police to search defendant's home and his car. They searched his home and seized a knife, some scissors, and some wet bloodstained clothing. They saw, but did not seize, a handgun. They searched his car and seized a red suspender. They took the car to the police station and two days later seized some carpet fibers. A second warrant was issued on 18 March, after it was discovered that the victim had been shot. This warrant authorized the police to search defendant's home for the handgun. However, they did not find it, and did not seize anything used as evidence at trial.

At the voir dire hearing SBI Agent John Payne testified as follows:

Q. All right. Now, in the course of this interview of the defendant, did you ask him for permission to search his vehicle?

A. Yes, sir.

Q. And did you ask him for permission to search his house where he lived?

A. Yes, sir.

Q. Okay, and did he give you permission?

A. Yes, sir, he did.

Q. Did he sign a written consent to search?

A. Yes, sir.

Q. Both his vehicle and his home?

A. Yes, sir.

Q. Do you have those with you?

A. Yes, sir, I have them.

. . . .

A. Yes, sir, I do. Exhibit 2 is a consent to search a 1973 Buick, four door, North Carolina license tag EPY 670. And State's Exhibit 3 is a consent to search the residence of 101 Lizi Street.

Q. And were those documents signed by the defendant in your presence?

A. Yes, sir, they were.

. . . .

Q. . . . Mr. Payne, did you threaten the defendant in any way to get him to sign those consents?

A. No, sir.

Q. Promise him anything to get him to sign them?

A. No, sir.

. . . .

Q. Now, after he had signed those consent forms, Mr. Payne, did you appear before the magistrate to get a search warrant to search his home and his vehicle?

A. Yes, sir, I did.

This testimony was corroborated by that of Chief Deputy Glenn Jernigan, who testified that he was present at the time defendant signed the forms.

After the hearing, the trial judge found as a fact, in addition to his findings that defendant was sober, coherent, and understanding, and was read his constitutional rights, that: "the defendant consented to the search of his home and vehicle and that he also signed a waiver permitting the officer to do this, consenting to the search." Findings of fact that are supported by competent evidence are binding on appeal. *State v. Williams*, 314 N.C. 337, 333 S.E. 2d 708 (1985). The trial judge's findings in the present case are amply supported by the testimony of Agent Payne and Chief Deputy Jernigan. "When a person voluntarily consents to a search, he cannot complain that his constitutional rights were violated . . . . Consent to search freely and intelligently given

renders competent the evidence thus obtained." *State v. Jolly*, 297 N.C. 121, 125, 254 S.E. 2d 1, 4 (1979). Therefore, the trial court properly denied defendant's motion to suppress this evidence.

[12]   Defendant next contends the trial court erred in denying his motion to limit the number of photographs of the victim the State could introduce. Defendant further assigns error to the trial court's overruling of his objections to those photographs. Defendant argues that the pictures presented by the State had no probative value, were repetitive, and were presented only to inflame the minds of the jurors. We disagree.

> Properly authenticated photographs of the body of a homicide victim may be introduced into evidence under instructions limiting their use to the purpose of illustrating the witness' testimony. Photographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words. The fact that the photograph may be gory, gruesome, revolting or horrible, does not prevent its use by a witness to illustrate his testimony.

*State v. Watson*, 310 N.C. 384, 397, 312 S.E. 2d 448, 457 (1984) (citations omitted).

> In the present case, the trial judge reserved his ruling on defendant's pretrial motion limiting the number of photographs until the time the issue arose at trial. At trial, the State offered into evidence seven photographs. Defendant objected to their admission and the trial judge held a voir dire hearing to determine their admissibility. At the hearing, the district attorney explained,

> Each one of these photographs show separate things. With respect to State's Exhibit 5, it is an area photograph taken from the greatest height of any of the photographs that I have which the purpose of that showing a greater portion of the general area where this body was found. In other words, it shows nothing about the body, simply shows the general area, shows 1105 and 1106 and all of this dirt path between 1105 and 1106 that has been discussed. State's Exhibit 6, your Honor, is a second area photograph, once again it shows nothing about the body. All it shows is it[']s a photograph

from a lower height and shows in a little more detail the specific area where the body was found. With respect to State's Exhibit 7, your Honor, that shows, it is taken from the ground, it shows, is taken from the area of the woods looking back towards the body, shows the dirt path that has been referred to in the testimony. State's Exhibit 8 is taken from a different direction showing, that is from the direction looking at the body from and looking in the direction towards the wooded area, more from the photograph standing in the area of where the path is looking at the body and back towards the wooded area showing the relationship between where the body was and where the woods started. Each of those two photographs that I have just mentioned show absolutely none of the wounds on the body from just looking at it, you could no more tell but what the body, just like somebody there asleep. The purpose of those is simply to show the location of where the body was with respect to the dirt path and the woods. State's Exhibit 9, your Honor, is a close up photograph of one side of the body, close up photograph from the back of the body, showing how her trousers are down and generally from the back of the body. State's Exhibit 10 is taken from the, looking at the body from the side, from the direction toward which she was turned and on which face her, facing the front portion of her trousers unfastened and showing, of course, showing some a little bit of the area where her head is lying there and the conditions there around that. Your Honor, we must of had 50 photographs.

. . .

I just found one more that is a photograph just shows the area where they recovered some cartridges fired and unfired cartridges, shows nothing about the body, that's just a field photograph, those two of the cartridges.

The trial judge made these findings: "[N]one of these photographs are gross or gore [sic] in any respect . . . two of them don't even show the body. The others don't show any gross manner [sic]. It seems to me that it . . . would probably assist the witness in . . . illustrating or explaining his testimony . . . they represent different shots for each purpose." The photographs were properly authenticated and the proper foundation was laid

for their admission. The trial judge instructed the jury that they were admitted "for the purpose of illustrating and explaining the testimony of the witness who uses the photograph. . . ."

We have examined the photographs at issue and they do not appear to be inflammatory or repetitive. We find no error in their admission.

[13] Defendant next assigns error to the trial court's admission of six statements, by six different witnesses. Defendant claims that each of these statements is inadmissible hearsay. The first statement excepted to was made by Deputy Glenn Jernigan at a pretrial hearing to determine the admissibility of evidence procured as a result of a search of defendant's home. Deputy Jernigan was explaining how he learned that the victim had been shot. He testified:

A: We received information from Steve Zawiskowski—

MR. KENAN: Objection.

COURT: Overruled.

A: That the victim had been shot and we knew that the pistol was there on Saturday, so we went back with a search warrant to seize it.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. N.C.G.S. § 8C-1, Rule 801(c). This statement was not offered to prove the truth of the matter asserted, that the victim was shot, but to explain why Deputy Jernigan procured a search warrant. This is not hearsay.

[14] The second statement defendant contends is hearsay was made by SBI Agent John Payne, who testified that Mr. Thelonus Burton, a friend of defendant's wife, told him that "he observed defendant's wife come out of the house with something that appeared to be a gun." This statement was not offered to prove the truth of the matter asserted, but to corroborate the previous testimony of Mr. Burton that defendant's wife had come out of the house with "something that appeared to be a gun." The trial judge instructed the jury that "this evidence is to the conversation of a previous witness, it is received into evidence for the purpose of corroborating the previous witness if you find that it does

so corroborate, it is not to be received by you for any other purpose."

Prior consistent statements made by a witness are admissible for purposes of corroborating the testimony of that witness, if it does in fact corroborate his testimony. *State v. Riddle*, 316 N.C. 152, 340 S.E. 2d 75 (1986). Admission of Agent Payne's testimony was not error.

The next statement defendant excepts to was made by Chief of Police R. P. Wood, who was testifying about the pistol. He testified, "I . . . called Chief Deputy Jernigan and told him I had a pistol there at the office that I thought he'd want to see, he told me he would be over." This statement was not offered to prove the truth of the matter asserted, that Chief Deputy Jernigan "would be over," but to explain Chief Wood's course of conduct. This is not hearsay.

[15] The next piece of evidence defendant excepts to is State's exhibit 25, a federal firearms form which was filled out by defendant and the salesman who sold defendant the murder weapon. It was filled out at the time defendant bought the gun. Mr. Wayne Bailey, the owner of the shop where the gun was purchased, testified that the form was a record kept in the course of the regular conduct of his business activity, and that it is the regular practice of his business activity to make such a record. He further testified that federal law required that he keep this form, and that the form had been kept in the place he normally keeps his business records. This form is clearly admissible under N.C.G.S. § 8C-1, Rule 803(6) which provides an exception to the rule against hearsay for records of regularly conducted business activity, if it is the regular practice of that business activity to make such a record.

The statements defendant next claims to be hearsay are various pieces of testimony by Mr. W. C. Elliot, a character witness for defendant. Although Mr. Elliot was asked on cross-examination a number of questions about whether he had heard about various occurrences, Mr. Elliot responded in the negative each time. He made no statements that can be classified as hearsay.

The statement defendant next excepts to was made by Ms. Sylvia Faison. She testified as to what her daughter had told her about a certain encounter with defendant. This statement was not offered to prove the truth of the matter asserted, but to corroborate the testimony of Ms. Faison's daughter, who had testified about the encounter immediately before Ms. Faison took the stand. Again, the trial judge gave the jury the proper limiting instruction. This assignment of error has no merit.

[16] Defendant next assigns error to the admission of six statements by four different witnesses. Defendant argues that these witnesses were "testify[ing] to assumptions." Ordinarily a witness may only testify concerning matters within his own personal knowledge. *State v. Adcock*, 310 N.C. 1, 310 S.E. 2d 587 (1983).

The first exception under this assignment of error is to the following testimony by Mr. Levon Hicks:

Q. So, where did you go then?

A. We went down some road and went out 24, went out some road and come out by the block plant and getting ready to take me home, he said, if you want some you better get it, I said, no I didn't want to mess with her.

Q. You wanted to get some, what was he talking about?

A. Some meat, I reckon. Get some meat.

Q. Was he talking about having sex?

A. Yes, sir.

Mr. Hick's testimony was not to an assumption, but was an explanation of a slang term which may not have been familiar to some jurors, but was familiar to Mr. Hicks. Although he did use the words "I reckon," this does not exclude the evidence, but goes to its weight for the jury to consider. *See Aarhus v. Wake Forest University*, 57 N.C. App. 405, 291 S.E. 2d 837 (1982).

The second and third exceptions deal with the following testimony of Mr. Joseph Steven Zawiskowski, an SBI specialist who was called to the scene of the crime:

Q. All right, and with respect to anything there around her feet, I believe you said, did you say one of her shoes was off?

A. Yes, sir, the right shoe, . . . I guess underneath the toe of the shoe was a red piece of material, we later determined it was part of a suspender.

MR. KENAN: Objection, at this time.

COURT: Objection is overruled.

. . .

Q. All right, State's Exhibit 7.

A. This is taken from this side of the body, I was taking the picture that way and just shows, that's what we're calling the road here, basically it[']s like any other farm area, they just have places where they drive the tractors and things.

MR. KENAN: Objection to all that.

COURT: Well, objection is overruled.

In these pieces of testimony, Mr. Zawiskowski was not testifying to assumptions, but simply describing what he remembered seeing.

The fourth exception deals with the following testimony by Mr. Zawiskowski:

A. Oh, yes. Yes, I did and I determined there was a lot of dried blood in the area and from what we saw at the time we just determined that she had died because of that cut on her throat.

MR. KENAN: Objection, your Honor, at this time.

. . .

COURT: Ladies and gentlemen, I want to refresh myself of what the witness testified, as I recall it, that having looked at this wound that described that they had assumed that that is what she had died from at the time. I'm going to admit that statement of the witness. The objection of the defendant is overruled, you may consider that.

Here, Mr. Zawiskowski was not making any assumption, but explaining why he and the other people present had made an assumption about the cause of the victim's death at the time they found the victim's body.

The fifth and sixth exceptions deal with the following testimony of Ms. Brenda Dew, an SBI forensic serologist:

Q. And what is it if an object or an article of clothing has blood on it and it is washed what is the affect that that has on—

MR. KENAN: Your Honor, we object to that form of question.

COURT: Do you want to be heard?

MR. KENAN: May we approach the bench?

COURT: Approach the bench. Objection is overruled. All right, Mr. Solicitor.

. . .

Q. If an article of clothing has blood on it and is washed sufficiently, could that completely eliminate any evidence of blood on that article?

MR. KENAN: Objection.

COURT: Overruled, if she knows.

A. I need to clarify one thing. Washing may not entirely remove the stain, however based upon the different tests that we performed in the laboratory, it makes it very difficult to determine that the stain actually is or actually to confirm the fact that the stain is blood. It becomes very diluted and as I stated the test that I performed [w]as just one of a series of tests, but because this had been exposed to washing type conditions, it became more and more diluted and as this happens it lessens the number of tests that can be performed on such a stain.

The final exception deals with the following testimony of Mr. Kenneth Raper, an SBI fingerprint examiner:

Q. Now, when, Mr. Raper, when an individual touches an object, do they always leave a latent fingerprint that you can examine and compare?

MR. PHILLIPS: Objection.

COURT: Overruled, if he knows.

A. No, an individual does not always leave latent fingerprints on an object when it[']s touched. It depends on the environment, object being touched and also the secretion of body fluids from the person against the object.

These expert witnesses were not testifying to assumptions but were explaining some of the mechanics of their fields of expertise. This assignment of error is without merit.

[17] Defendant next contends the trial court erred in denying defendant's motion to dismiss all charges at the close of the State's case, and his motion to dismiss all charges at the conclusion of all the evidence. He further contends the trial court erred in submitting the charges to the jury. Defendant argues in support of these contentions that there was insufficient evidence to convict defendant of the crimes charged.

When a defendant moves for dismissal, a trial court must determine, for each charge, whether there is substantial evidence of each essential element of the offense charged, and of defendant's being the one who committed the crime. If that evidence is present, the motion to dismiss should be denied. *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* In ruling on a motion to dismiss, the court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn from the evidence. *Id.* Contradictions and discrepancies must be resolved in favor of the State. *Id.*

Defendant in the present case was convicted of first-degree murder and attempted first-degree rape. First-degree murder is defined in N.C.G.S. § 14-17 as follows:

A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing,

or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree. . . .

First-degree rape is defined in N.C.G.S. § 14-27.2 in pertinent part, as follows:

A person is guilty of rape in the first degree if the person engages in vaginal intercourse:

. . .

(2) With another person by force and against the will of the other person, and:

a. Employs or displays a dangerous or deadly weapon or an article which the other person reasonably believes to be a dangerous or deadly weapon; or

b. Inflicts serious personal injury upon the victim or another person; or

. . .

We find that the evidence, as set forth in the beginning of this opinion, is substantial evidence of each essential element of both first-degree murder and attempted first-degree rape, and is substantial evidence that defendant committed these crimes. Defendant's motions to dismiss were properly denied, and these charges were properly submitted to the jury.

Defendant next contends the trial court erred in denying his motion to set aside the jury's verdict, as being against the greater weight of the evidence. The decision whether to grant or deny such a motion is within the sound discretion of the trial judge, and is not reviewable absent a showing of an abuse of discretion. *State v. Wilson*, 313 N.C. 516, 330 S.E. 2d 450 (1985). Since we have held that the evidence in the present case is sufficient to support the jury's verdict, we can find no abuse of discretion in the trial court's denial of defendant's motion to set aside the verdict.

Defendant next contends the trial court erred in permitting the district attorney to argue "improper matters," specifically

three statements. Defendant did not object to any of these statements; he contends the trial judge should have corrected them *ex mero motu*. In hotly contested cases counsel will be given wide latitude in arguments to the jury and are permitted to argue the facts which have been presented as well as all reasonable inferences which can be drawn from them. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984). The State's argument in capital cases is subject to limited appellate review for the existence of gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu. State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982).

**[18, 19]** One of the statements excepted to is as follows: "They put him in jail, on Sunday as you heard Mr. Burton testify, his wife came over to see him in jail and don't you know what he told her is get that gun and hide that gun." This statement referred to the evidence that defendant's gun was present at his home when it was searched on 16 March, but was no longer there when the officers returned on 18 March. Mr. Thelonus Burton had testified that defendant's wife visited defendant in jail on 17 March. The district attorney's statement was a reasonable inference drawn from these pieces of evidence.

The other two statements excepted to are as follows:

[A]nd we all know that there are guilty people walking the streets of this country every day because the government cannot collect enough evidence to try them for crimes and for jury to find them guilty.

However, I submit to you that it's better that there are guilty people who go free than an innocent person to be wrongfully convicted.

These statements were made in the context of explaining the burden of proof to the jury:

We accept the burden of proof, we told you on Monday when we were selecting the jury, that the burden of proof was on us. I guess that's another thing Mr. Phillips and we all agree on in this case, is that the burden should be on the government, it should be on the State, that's the way it is in this country. We accept that and we all know that there are

guilty people walking the streets of this country everyday because the government cannot collect enough evidence to try them for crimes and for jury to find them guilty. We realize that that's a penalty or price that we have to pay to live in a free society. Unlike countries as Iran and the Soviet Union and China and some of these countries where a person is brought to Court and he has to prove his innocence, we don't operate that way. However, I submit to you that it's better that there are guilty people who go free than an innocent person to be wrongfully convicted. We all would agree to that, I believe. However, members of the jury, I would strongly contend to you that Russell Holden, Jr. is not an innocent person . . . He's presumed to be innocent, but, folks, I believe and I would contend to you that the State has met its burden, we have proven him guilty beyond a reasonable doubt.

It is clear that these statements, when read in context, were not improper. This assignment of error has no merit.

[20]   Defendant next contends the trial court erred in refusing to declare unconstitutional N.C.G.S. § 15A-2000, the statute which authorizes the imposition of the death penalty. Defendant argues that the death penalty constitutes cruel and unusual punishment when a jury has discretion whether or not to impose it. This argument has been rejected consistently by this Court. *See, e.g., State v. Young,* 312 N.C. 669, 325 S.E. 2d 181 (1985); *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197, *cert. denied,* 469 U.S. 963, 83 L.Ed. 2d 299 (1984); *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983). Defendant has given us no reasons to disregard or overrule our prior decisions.

[21]   Defendant next contends the trial court erred in excusing a juror, Mrs. Eva Brinson, after the completion of the guilt phase and prior to the sentencing phase. Defendant argues that it is probable that had Mrs. Brinson remained on the jury, defendant would not have received the death penalty.

During the voir dire of the jury prior to trial, Mrs. Brinson testified that she could vote for the death penalty:

Q. . . . Mrs. Benson [sic], do you believe in the death penalty in certain types of cases?

A. Well, yes, in certain types of cases I do.

Q. Then your answer, you're saying that under certain circumstances that you could . . . return a verdict and impose the death penalty; is that correct?

A. Yes.

However, after the guilt phase was complete, the trial court learned that she had changed her mind, and decided to excuse her:

COURT: . . . Now, I understand that this morning that you told someone that you could not kill him or could not sentence this man to death; is that what you said?

A. Well, yes, I thought I could, it was an experience I never experienced before and I thought I could fully abide by the rules and the regulations, but I can't.

COURT: And now, you're saying that you can not. Are you saying then that because of this now that your view of the death penalty will prevent you from your sworn duty as a juror under oath and instructions, that you cannot follow your oath as you previously said; is that what you're telling me?

A. Well, I have listened to everything. I have prayed over it and I did make that statement and I don't think I can. I'm just being real honest.

COURT: Mr. Solicitor, do you desire to examine the juror? Mr. Defense, do you desire to examine the juror?

MR. KENAN: A few questions, your Honor. Mrs. Brinson, I understand about your personal feelings, but would you set your personal feelings aside and listen to the Judge's instructions and from that particular point follow the Judge's instructions of law; could you not dot [sic] hat [sic] or would you not do that, Mrs. Brinson?

A. I would do it if I could, but I can't.

COURT: Well, then you mean you've already formed an opinion without hearing any evidence. Well, ma'am, if that is so then I have no alternative but to dismiss you and I

will therefore in my discretion based upon your statement that you have already predetermined at this time without hearing the charge of the Court or the lawyers speak this morning, without really hearing the evidence, that you would not impose the death sentence under any circumstances that the Court will now excuse you for that reason and will seat the alternate in your place. The Court feeling that it[']s necessary in the interest of justice to do so, there will be no alternative. Therefore, juror number three, Mrs. Brinson, is withdrawn for the reasons stated and that the alternate juror is seated in this chair.

MR. KENAN: I know you made your ruling, but I'd like to ask one question. Mrs. Brinson, you have formed an opinion before you've heard the arguments of counsel and the evidence in this particular case about whether or not he should live or die?

A. Well, for the last two days I haven't slept, it was just upsetting me and I just thought I could abide by the rules and regulations when I made a sworn statement, but it was really bothering me every since I brought the verdict out of life and death, then I just haven't been able to rest because I knew that the second verdict was life or death and I have prayed over it and I just can't. I'm just sorry. I thought I could, but I can't.

COURT: So, you're being fair and honest and I appreciate that and so, ma'am, you may stand aside, I will let you go.

MR. KENAN: We object, your Honor.

N.C.G.S. § 15A-2000(a)(2) provides, in pertinent part:

If prior to the time that the trial jury begins its deliberations on the issue of penalty, any juror dies, becomes incapacitated or disqualified, or is discharged for any reason, an alternate juror shall become a part of the jury and serve in all respects as those selected on the regular trial panel.

In *State v. Nelson*, 298 N.C. 573, 260 S.E. 2d 629 (1979), this Court held:

The trial judge has broad discretion in supervising the selection of the jury to the end that both the state and de-

fendant may receive a fair trial. . . . This discretionary power to regulate the composition of the jury continues beyond empanelment. . . . These kinds of decisions relating to the competency and service of jurors are not reviewable on appeal absent a showing of abuse of discretion, or some imputed legal error.

. . .

A defendant is not entitled to a jury of his choice and has no vested right to any particular juror. So long as the jurors who are actually empaneled are competent and qualified to serve, defendant may not complain.

*Id.* at 593, 260 S.E. 2d at 644. Citations omitted.

In *Barts*, 316 N.C. 666, 343 S.E. 2d 828, this Court held: "The decision of whether to reopen examination of a juror previously accepted by both parties is a matter within the discretion of the trial court. . . . Once the trial court has exercised its discretion to reopen the examination of any juror, the trial court may excuse the juror for cause. . . ." *Id.* at 680-681, 343 S.E. 2d at 838 (citations omitted). In that case, the court reopened the examination of a juror who "emphatically stated that there were no circumstances under which she would be able to vote for the imposition of the death penalty." This Court held that she was therefore properly excused for cause.

Our decision in the present case is controlled by our decisions in *Nelson* and *Barts*. We hold that the trial judge did not abuse his discretion in reopening the examination of Mrs. Brinson, and then excusing her for cause. The alternate substituted in her place had been accepted by both parties, and had been empaneled with the other jurors and had heard all the evidence. This assignment of error is without merit.

[22] Defendant next assigns error to the trial court's denial of his motion to require the State to file a bill of particulars reciting the aggravating factors it intended to rely on at the punishment phase. A trial court may not require that the State declare which aggravating factors it intends to rely on at the punishment phase. *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982); *Taylor*, 304 N.C. 249, 283 S.E. 2d 761. N.C.G.S. § 15A-2000(e) sets forth the only aggravating fac-

tors the State may rely upon in seeking the death penalty. The notice provided by this statute is sufficient to satisfy the constitutional requirements of due process. *Young*, 312 N.C. 669, 325 S.E. 2d 181.

[23]  Defendant next contends the trial court erred in admitting evidence of defendant's prior conviction during the prosecution's case in chief at the sentencing phase of the trial. Defendant argues that the court thereby allowed the prosecution to introduce evidence of defendant's bad character before defendant had put his character in issue. We assume defendant means to argue that this is a violation of Rule 404(a) of the North Carolina Rules of Evidence. We disagree.

Rule 404(a) states: "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion. . . ." In the present case, the evidence concerning defendant's prior conviction was not admitted for this purpose, but as evidence of the aggravating circumstance set out in N.C.G.S. § 15A-2000(e)(3): "The defendant had been previously convicted of a felony involving the use or threat of violence to the person." The State is entitled to introduce, at the sentencing phase of the trial, any competent evidence which supports any of the aggravating factors set out in N.C.G.S. § 15A-2000(e). Defendant's assignment of error is overruled.

[24]  In a similar vein, defendant contends the trial court erred in allowing the State's witnesses to testify, at the sentencing phase of the trial, "as to specific acts of misconduct by the defendant which were not similar or part of a common scheme." We assume defendant means to argue that this is a violation of Rule 404(b) of the North Carolina Rules of Evidence, which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

The evidence defendant has excepted to here was the testimony of five witnesses for the State, all of whom testified during

the State's rebuttal. Defendant had introduced evidence tending to show a lack of prior criminal activity, to support the statutory mitigating factor set out in N.C.G.S. § 15A-2000(f)(1): "The defendant has no significant history of prior criminal activity." In rebuttal, the State called these five witnesses, each of whom testified to some prior criminal activity by defendant, namely two rapes and three assaults. The trial court properly admitted this testimony. *Maynard*, 311 N.C. 1, 316 S.E. 2d 197.

Defendant next contends the trial court erred in permitting the district attorney to argue "improper matters" in his argument at the penalty phase. Again, defendant did not object to these statements; he contends the trial judge should have corrected them *ex mero motu.*

Again, the State's argument in capital cases is subject to limited appellate review for the existence of gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu. Pinch*, 306 N.C. 1, 292 S.E. 2d 203.

[25] The first statement defendant complains about is:

> Based on the evidence that you've heard, ladies and gentlemen, I would contend to you that the next factor you should also answer no to is really an aggravating factor rather than a mitigating factor and that is their contention that it's mitigating that the defendant was an active member of the Warsaw Rescue Squad, gave CPR to a victim while working with a rescue squad.

When this remark is read in context, it is clear that the district attorney was only arguing that the jury should not find this to be a mitigating factor. The district attorney continued: "We would contend to you, ladies and gentlemen, that because he had used his position as a member of the rescue squad to commit one of these rapes that he committed that you should not find that as a mitigating factor." A statement similar to the one complained of was held not to be improper in *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983). As in *Kirkley*, any possible confusion was eliminated by the judge's instructions.

[26] Defendant also complains about these and other similar statements: "[H]e should not be out there on the street and given

the opportunity to commit this crime again." "[T]he only way you can be sure, ladies and gentlemen, that there will be no more is if you give him the death penalty." We held in *Johnson*, 298 N.C. 355, 259 S.E. 2d 752, that statements very similar to these were not improper.

[27] Defendant also complains about these and other similar statements: "You know and I know and anybody with good sense would know that if he gets out there he's going to do it again." "How many more women are we going to have to see this man rape before we say enough is enough?" These statements may be marginally improper. Considering, however, their speculative tone, we cannot say they are so grossly improper as to require the trial judge to correct them *ex mero motu.*

[28] Defendant also complains about these and other similar statements: "The victim didn't have an opportunity to have Mr. Kenan and Mr. Phillips represent her on March the 16th 1985." "Think of the victim." "I submit that she cries out from the grave for justice." It is not improper for the State to refer in its argument to the victim's suffering. *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984); *Oliver*, 309 N.C. 326, 307 S.E. 2d 304.

[29] Defendant also complains about this statement: "I wish I had a quarter for every defendant that we've ever gotten up here that says after he got in jail he found the Lord and now he's got religion." This statement tends to imply that a large number of criminal defendants claim to have "gotten religion," a fact not in evidence. For that reason, it may be marginally improper. Considering, however, the speculative and rather flippant tone of the statement, and the insignificance of the fact implied, we cannot say that the statement is so grossly improper as to require correction *ex mero motu.*

We hold that none of the remarks defendant complains about constitutes reversible error.

Defendant next assigns error to the trial court's denial of his oral request for a special jury instruction about the testimony of rebuttal witnesses at the sentencing phase. All the record contains relating to this assignment of error is the following statement by the court:

COURT: Let the record show that counsel for the defendant, Mr. Reginald Kenan, requested a pre-emptory instruction as to the state's rebuttal witness that this went to the character rather than to the matter in fact, as regarding aggravation and the Court denied the motion, being unable to separate it and if it was the Court believing that if it was admissible in aggravation it was inadmissible for all other purposes. Motion denied. . . .

Requests for special instructions must be in writing. N.C.G.S. § 15A-1231(a); *State v. Harris*, 47 N.C. App. 121, 266 S.E. 2d 735 (1980), *cert. denied*, 305 N.C. 762, 292 S.E. 2d 577 (1982); Superior and District Court Rule 21. Defendant in the present case did not comply with these provisions.

Rule of Appellate Procedure 10(b)(2) provides, in pertinent part, "An exception to the failure to give particular instructions to the jury . . . shall identify the omitted instruction . . . by setting out its substance immediately following the instructions given. . . ." Defendant in the present case has not complied with this rule.

Since defendant has not complied with these rules, we have only a vague idea of what instruction defendant actually requested, and thus we can only guess whether or not it was proper. Avoidance of this predicament was surely one of the reasons these rules were adopted. This assignment of error is overruled.

[30] Defendant next assigns error to the trial court's denial of his request for peremptory instructions on all 15 of the mitigating circumstances placed before the jury. Where all of the evidence in the case, if believed, tends to show that a particular mitigating factor exists, defendant is entitled to a peremptory instruction on that factor if he requests it. *State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369 (1985). However, a peremptory instruction is inappropriate when the evidence surrounding that issue is conflicting. *Id.*

The first three mitigating factors presented were statutory, based on N.C.G.S. § 15A-2000(f)(1), (2), and (6). In each of these cases, evidence was presented from which the jury could find that the proposition stated was not true. In the case of the fourth mitigating factor, based on N.C.G.S. § 15A-2000(f)(7), "the age of

the defendant at the time of the crime," the jury could find that defendant's age, 30, was not a mitigating factor.

The remaining eleven mitigating factors presented were not statutory. The jury found five of them; defendant can claim no prejudice in the trial court's failure to give peremptory instructions on these five.

The jury failed to find the other six non-statutory factors presented. In the case of each of these six, there was evidence from which the jury could find either that the proposition stated was not true, or that even if true it was of no mitigating value. Thus, peremptory instructions would have been inappropriate. This assignment of error is overruled.

[31]  Defendant next contends the trial court erred in refusing to submit defendant's fifteen requested instructions to the jury. Defendant's requested instruction number one contains this statement: "If all 12 of you cannot unanimously agree within a reasonable time to a verdict sentencing the defendant to death, the law requires that I then impose a life sentence. . . ." Defendant's proposed instructions numbers fourteen and fifteen contained similar statements. We have repeatedly held that such an instruction is improper "because it would be of no assistance to the jury and would invite the jury to escape its responsibility to recommend the sentence to be imposed by the expedient of failing to reach a unanimous verdict." *Young*, 312 N.C. 669, 685, 325 S.E. 2d 181, 191 (citations omitted). The court correctly refused to give this instruction.

Defendant's requested instruction number five would have required the jury to mark its answer as to each mitigating factor in the space following that mitigating factor. The record reveals that the judge instructed the jury to do this, and the jury followed his instruction.

[32]  Defendant's requested instruction number six was to the effect that for each mitigating circumstance, "The burden is on the State to prove beyond a reasonable doubt that this mitigating circumstance does not exist." This is an incorrect statement of the law. The burden of proof on the existence of any mitigating circumstance is on the defendant, and the standard of proof is by a preponderance of the evidence. *State v. Johnson*, 298 N.C. 47, 257

S.E. 2d 597 (1979). The court correctly refused to give this instruction.

[33] Defendant's requested instruction number seven is as follows:

> With respect to each of the mitigating circumstances, only those mitigating circumstances unanimously found by you to exist should be marked "yes" by you on the verdict sheet. However, no single juror is precluded from considering anything in mitigation in the ultimate balancing process, even if that mitigating factor was not considered or agreed upon by all 12 of you unanimously.

This is also an incorrect statement of the law. A jury must unanimously find that a mitigating circumstance exists before it may be considered for the purpose of sentencing. *Kirkley*, 308 N.C. 196, 302 S.E. 2d 144. The court correctly refused to give this instruction.

[34] Defendant's requested instruction number eleven contains this statement: "Evidence that the defendant's mental or emotional development was significantly below that of persons of his chronological age is a mitigating circumstance which is entitled to great weight." This is also an incorrect statement of the law, for two reasons. First, while a defendant's mental or emotional development is a relevant part of the analysis of the mitigating factor of age, the relationship between his mental and emotional development and that of persons of his chronological age is not the determinative factor. The court in the present case correctly instructed the jury, "In determining whether this factor exists in this case, you are instructed that 'age' as it is used under the law is not restricted to chronological age. 'Age' includes the defendant's mental, emotional and physical development, his experience, and criminal tendencies. . . ." *See Oliver*, 309 N.C. 326, 307 S.E. 2d 304. Second, a judge may not instruct a jury that a particular circumstance is "entitled to great weight." The jury has the duty of deciding how much weight to give to each aggravating and mitigating circumstance. *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983). The court correctly refused to give this instruction.

[35]   Defendant's requested instruction number twelve contains this statement:

> I instruct you that even if you find that the aggravating circumstance is sufficiently substantial to call for the imposition of the death penalty in light of the mitigating circumstances, you must unanimously and beyond a reasonable doubt find that death is the appropriate punishment in this case for this defendant.

This is an incorrect statement of the law in that it implies that the jury may find that the aggravating circumstances found are sufficiently substantial to call for the imposition of the death penalty, and find that the mitigating circumstances do not outweigh the aggravating circumstances, and then decide not to impose the death penalty. This the jury may not do. As we stated in *Pinch*, 306 N.C. 1, 292 S.E. 2d 203, the jury must recommend the death penalty if it makes the three findings necessary to support such a sentence under N.C.G.S. § 15A-2000(c):

(1) The statutory aggravating circumstance or circumstances which the jury finds beyond a reasonable doubt; and,

(2) That the aggravating circumstance or circumstances found by the jury are sufficiently substantial to call for the imposition of the death penalty; and,

(3) That the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found.

The court correctly refused to give defendant's instruction.

[36]   Defendant's requested instruction number thirteen contains these statements:

> For the typical case of premeditated and deliberated murder, the appropriate penalty is imprisonment of the defendant for the balance of his natural life.

> [I]t is important that you keep in mind that the proper sentence for the normal cases of premeditated and deliberated murder is imprisonment for life.

These are also incorrect statements of the law. N.C.G.S. § 15A-2000 establishes the method by which a jury decides which penal-

ty is appropriate. These references to "typical" and "normal" cases of premeditated and deliberated murder are not consistent with the statutory scheme. The court correctly refused to give this instruction.

Defendant's remaining requested instructions numbers two, three, four, eight and nine (there is no number ten), may not be legally incorrect. Defendant has not shown, however, how he was prejudiced by the trial court's failure to give those instructions verbatim. In several instances, we find defendant's requested instructions to be wordy, repetitive, and potentially confusing. We have examined the instructions given in this case and find them to be legally correct, clear and complete. This assignment of error is overruled.

[37] The defendant next contends the trial court erred in submitting three aggravating circumstances to the jury. He argues that the aggravating circumstance, "Had Russell Holden, Jr. been previously convicted of a felony involving the use of violence to the person?" was erroneously submitted because it was based on a record of his plea of no contest in 1984 to a charge of attempted rape. A sentence was imposed on this plea. The question posed by this argument is whether a plea of no contest followed by a final judgment imposing a sentence is a conviction under N.C.G.S. § 15A-2000(e) which provides in part:

Aggravating circumstances which may be considered shall be limited to the following:

. . .

(3) the defendant had been previously convicted of a felony involving the use or threat of violence to the person.

The use of a plea of no contest in a case other than the one in which it is entered has been at issue in several cases. See State Bar v. Hall, 293 N.C. 539, 238 S.E. 2d 521 (1977); Fox v. Scheidt, Comr. of Motor Vehicles, 241 N.C. 31, 84 S.E. 2d 259 (1954); Mintz v. Scheidt, 241 N.C. 268, 84 S.E. 2d 882 (1954) and Winesett v. Scheidt, Comr. of Motor Vehicles, 239 N.C. 190, 79 S.E. 2d 501 (1954). See also Reticker, Nolo Contendere in North Carolina, 34 N.C.L.R. 280 (1955). A no contest plea is not an admission of guilt. It is a statement by the defendant that he will not resist the imposition of a sentence in the case in which the plea is entered. In

that case the defendant is treated as if he had pled guilty. A court may not accept a plea of no contest without first determining there is a factual basis for the plea. N.C.G.S. § 15A-1022. A no contest plea may not be used in another case to prove that the defendant committed the crime to which he pled no contest because he has not admitted he committed the offense. That is not what was done in this case. It is important that the statute does not require proof that the defendant actually committed the offense. It only requires proof that he was convicted of the offense. The question presented in this case is not whether the no contest plea may be used to prove the aggravating circumstance but whether proof of the no contest plea and final judgment entered thereon constitute a conviction within the meaning of the statute. We hold it is a conviction within the statute's meaning and was properly found as an aggravating circumstance.

[38] The second aggravating factor submitted was: "Was the murder committed for the purpose of avoiding or preventing a lawful arrest?" At trial, Mr. Levon Hicks testified that defendant, on the night of the murder, referring to the victim said, "he was going to get some meat, but if he got it, he'[d] probably have to kill her so she wouldn't tell nobody." Mr. Jessie Sutton testified that he had asked defendant if defendant had gone to jail for raping another girl, and defendant had replied that, "if he had known he was going to go to jail, he would have killed the girl." Mr. Johnny Williams testified that defendant told him "the next girl he raped that he was going to kill her." ". . . because if I kill her I don't have to worry about her talking." These statements are sufficient evidence for the jury to infer that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime of rape. Therefore this aggravating factor was not erroneously submitted. See Williams, 304 N.C. 394, 284 S.E. 2d 437.

The third aggravating factor submitted was: "Was this murder committed while Russell Holden, Jr., was attempting to commit rape?" As we have previously stated, sufficient evidence was presented in this case for the jury to find that defendant attempted to commit rape. This aggravating factor was not erroneously submitted. Defendant's assignment of error has no merit.

**[39]** Defendant next contends the trial court erred in sustaining the State's objection to a portion of defense counsel's argument, where defense counsel began to describe the execution procedure. Defendant argues that he had the right to inform the jury of the things he would encounter if he were sentenced to death. We disagree.

In arguments to the jury, counsel may only argue the evidence which has been presented, and all reasonable inferences which can be drawn from the evidence. *Hamlet*, 312 N.C. 162, 321 S.E. 2d 837. Any discussion of the execution procedure would not have been drawn from the evidence presented. In fact, any evidence on that subject would have been inadmissible as irrelevant. *Johnson*, 298 N.C. 355, 259 S.E. 2d 752. We stated in *State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L.Ed. 2d 324 (1985), that the portion of defense counsel's argument in that case describing the execution procedure was "irrelevant, and highly improper." *Id.* at 425, 319 S.E. 2d at 201. In the present case, the court correctly sustained the State's objection.

**[40]** Defendant further assigns error to the trial court's sustaining of the State's objection to a portion of defense counsel's jury argument where defense counsel began to ask each juror individually to spare defendant's life.

Again, in arguments to the jury, counsel may only argue the evidence which has been presented, and all reasonable inferences which can be drawn from the evidence. *Hamlet*, 312 N.C. 162, 321 S.E. 2d 837.

This portion of defendant's argument was improper in that it asked each individual juror to decide defendant's fate on an emotional basis, in disregard of the statutorily prescribed procedure of N.C.G.S. § 15A-2000, and in disregard of the jurors' duty to deliberate with the entire jury toward the end of reaching a unanimous verdict. The trial court properly sustained the State's objection.

Defendant next contends the trial court erred in refusing to set aside the jury's recommendation of the death sentence. We disagree. A trial court is obligated to enter a judgment consistent with a jury's unanimous recommendation that a defendant be sen-

tenced to death, and has no authority to set aside such a recommendation. *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982). This assignment of error has no merit.

[41] As a final matter in every capital case, we are directed by N.C.G.S. § 15A-2000(d)(2) to review the record and determine (1) whether the record supports the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We find, for reasons already stated, that the record contains ample support for the jury's finding the three aggravating circumstances. We also find that the record does not contain anything which suggests the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

To determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant, we refer to the pool of cases established in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335 *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177 (1983):

> In comparing "similar cases" for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* at 79, 301 S.E. 2d at 355 (emphasis in original). The pool includes only those cases in which this Court has found no error in both the guilt and penalty phases. *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983).

The purpose of our review is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant

jury. *State v. Rogers*, 316 N.C. 203, 341 S.E. 2d 713 (1986). To achieve this purpose, we

> compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E. 2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985).

In looking at cases from the pool which are most similar to the present case, we have found several cases in which the defendant killed his victim either after or in the process of sexually assaulting her.

In *McDougall*, 308 N.C. 1, 301 S.E. 2d 308, the defendant voluntarily injected cocaine, gained entry into the victim's home by guile, cut and stabbed the victim with a butcher knife. There was strong evidence that he killed her while attempting to rape her. The jury found three aggravating factors: a previous conviction of a violent felony, the murder was especially heinous, atrocious and cruel, and it was part of a course of conduct including a crime of violence by the defendant against another person. The jury found two mitigating factors: defendant was under the influence of mental or emotional disturbance, and his capacity to appreciate the criminality of his conduct or to conform to the requirements of law was impaired. The jury recommended the death sentence, and this Court upheld the jury's recommendation.

In *State v. Vereen*, 312 N.C. 499, 324 S.E. 2d 250, *cert. denied*, 471 U.S. 1094, 85 L.Ed. 2d 526 (1985), the defendant entered the seventy-two-year-old victim's home, strangled her, stabbed her and sexually assaulted her. The jury found three ag-

gravating factors: a previous conviction of a violent felony, the murder was committed while defendant was engaged in first-degree burglary or attempted first-degree rape, and it was part of a course of conduct including a crime of violence by defendant against another person. The jury found, without specifying, the existence of one or more mitigating factors. The jury recommended the death sentence, and this Court upheld the jury's recommendation.

In *Smith*, 305 N.C. 691, 292 S.E. 2d 264, defendant kidnapped, raped and tortured his victim. He finally beat her to death and threw her in a pond. The jury found as aggravating factors that the murder was committed while defendant was engaged in the commission of or attempted commission of rape, robbery, and kidnapping of the deceased, and that the murder was especially heinous, atrocious, or cruel. The jury found one mitigating factor: the murder was committed while the defendant was under the influence of mental or emotional disturbance. The jury recommended the death sentence, and this Court upheld that recommendation.

In *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732, *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (1981), the defendant beat his victim, cut her, raped her, and ran over her body with his car. The jury found three aggravating factors: the murder was committed while the defendant was engaged in the rape and kidnapping of the victim, and it was especially heinous, atrocious or cruel. The jury found one or more mitigating circumstances but did not specify which ones. Again, this Court upheld the jury's recommendation of the death sentence.

In *Williams*, 308 N.C. 47, 301 S.E. 2d 335, the defendant struck the 100-year-old victim and battered her with clock weights, sexually assaulted her with a mop handle, ransacked her house and left her to die. The jury found four aggravating factors: the murder was committed while defendant was engaged in first-degree burglary, and while he was engaged in a sexual act, the murder was committed for pecuniary gain and was heinous, atrocious and cruel. The jury found no mitigating circumstances. This Court upheld the jury's recommendation of the death sentence.

In *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1979), the defendant strangled, stabbed and raped his victim. The jury

found three aggravating factors: the defendant had a previous conviction of a violent felony, the murder was committed while the defendant was engaged in rape, and was especially heinous, atrocious and cruel. The jury did not reach the mitigating factors. In this case, the jury recommended a life sentence.

Clearly, juries have tended to return death sentences in murder cases where the defendant also sexually assaulted his victim. We also note that this Court has never found a death sentence disproportionate in such a case. It is true that defendant in the present case did not inflict on his victim as much torture as some of these defendants inflicted on their victims. However, none of these defendants seemed to be as cold and calculating about the crimes they were about to commit as was defendant in the present case.

We have, in our examination, come across several cases which are similar to the present case in that the defendant murdered the victim to eliminate a witness to a crime by the defendant.

In *Lawson*, 310 N.C. 632, 314 S.E. 2d 493, the defendant shot and killed the owner of a home after the owner caught the defendant burglarizing the home. The jury found two aggravating factors: the murder was committed for the purpose of avoiding a lawful arrest, and was part of a course of conduct including a crime of violence against another person. The jury found one or more mitigating factors, but did not specify which ones. The jury recommended the death sentence, and this Court upheld that recommendation.

In *Maynard*, 311 N.C. 1, 316 S.E. 2d 197, the defendant beat his victim in the head and shot him, and threw his body in a river. His sole reason for doing so was that the victim had agreed to testify against the defendant in another matter, pursuant to a plea arrangement. The jury found two aggravating factors: the murder was committed to hinder the enforcement of laws, and was especially heinous, atrocious, and cruel. The jury found two non-statutory mitigating factors. This Court upheld the jury's recommendation of the death sentence.

In *Oliver*, 309 N.C. 326, 307 S.E. 2d 304, defendant was robbing a convenience store. He shot and killed a customer at the

store to eliminate him as a witness to the robbery. The jury found two aggravating factors: the murder was committed to avoid arrest, and was committed for pecuniary gain. No mitigating factors were found. This Court upheld the jury's recommendation of the death sentence.

In *State v. Fields*, 315 N.C. 191, 337 S.E. 2d 518 (1985), the defendant, after consuming quantities of beer and Quaaludes, was robbing a house. A neighbor came over to investigate, and defendant shot and killed him. The jury found as an aggravating factor that the murder was committed to avoid arrest. The jury found three non-statutory mitigating factors. The jury recommended life imprisonment.

In *State v. Fox*, 305 N.C. 280, 287 S.E. 2d 887 (1982), the defendant robbed a convenience store, made the cashier leave with him, took her down a dirt road, stabbed her with a knife, and left her to die. The jury found as aggravating factors that the murder was committed to avoid arrest, and was committed while defendant was engaged in the robbery of the victim. In its recommendation the jury did not reach the mitigating factors, but recommended life imprisonment.

Our study reveals that juries have often recommended the death sentence in witness-elimination cases. We also note that this Court has never found a death sentence disproportionate in such a case. In holding that the death sentence was not disproportionate in *Oliver*, 309 N.C. 326, 307 S.E. 2d 304, we noted that "[m]urder can be motivated by emotions such as greed, jealousy, hate, revenge, or passion. The motive of witness elimination lacks even the excuse of emotion." *Id.* at 375, 307 S.E. 2d at 335. The murder in the present case was as cold and calculated as a murder can be, as demonstrated by defendant's statement that "he was going to get some meat, but if he got it, he'[d] probably have to kill her so she wouldn't tell nobody." Rarely have we ever seen such a callous disregard for another's life.

One member of this Court has suggested "[t]he death penalty, if we are to have it at all, should be reserved for first degree murders which are the products of the meanness of mature, calculating, fully responsible adults." *Rook*, 304 N.C. 201, 247, 283 S.E. 2d 732, 759 (Exum, J., now C.J., dissenting in part). Even under such a standard, the present case warrants the death penalty.

In comparing this case to similar cases, and in considering both the crime and the defendant, we do not find that the death sentence was excessive or disproportionate. We therefore decline to set it aside.

No error.

Chief Justice EXUM concurring.

Were we deciding the issue for the first time, I would agree with defendant's contention that the trial court erred in failing to give defendant's requested instruction number seven, which is:

With respect to each of the mitigating circumstances, only those mitigating circumstances unanimously found by you to exist should be marked "yes" by you on the verdict sheet. However, no single juror is precluded from considering anything in mitigation in the ultimate balancing process, even if that mitigating factor was not considered or agreed upon by all 12 of you unanimously.

This is precisely the instruction suggested by the state in *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983) (Exum, J., dissenting). As the state's brief then put it, such an instruction should be given in order that "no juror . . . be precluded from considering anything in mitigation in the ultimate balancing process even if that mitigating factor was not agreed upon unanimously. To do otherwise, the State believes, could run afoul of *Lockett v. Ohio*, [438 U.S. 586 (1978)]." *Id.* at 228, 302 S.E. 2d at 163.

I continue to think, as I wrote in dissent in *Kirkley*, that in the final balancing process the rationale of *Lockett* would suggest that each juror must be permitted to consider any circumstance he or she concludes exists and has mitigating value whether or not all other jurors agree.

The Court held to the contrary in *Kirkley*; and *Kirkley*, being the law on this point, controls the issue here contrary to defendant's contention.

Justice FRYE dissenting as to sentence.

I believe that defendant is entitled to a new sentencing hearing. The majority holds that proof of a no contest plea and final

judgment entered thereon constitutes a conviction within the meaning of the capital punishment statute. I do not agree.

Our capital punishment statute, N.C.G.S. § 15A-2000, carefully limits the aggravating circumstances that may be considered by the jury in recommending a sentence of death. As the majority recognizes, a plea of no contest does not establish the fact of guilt for any other purpose than in the case in which the plea is entered. *State Bar v. Hall*, 293 N.C. 539, 238 S.E. 2d 521 (1977). Therefore, when the General Assembly intends that a no contest plea be treated as a conviction, it says so clearly. An example is found under the Fair Sentencing Act, which provides: "[a] person has received a prior conviction when he . . . has entered a plea of guilty or no contest to a criminal charge." N.C.G.S. § 15A-1340.2 (4) (1983). However there is no similar provision in the capital punishment statute. Under the North Carolina Rules of Evidence, a plea of no contest is not the same as a plea of guilty. N.C.G.S. § 8C, Rule 410 (1986). We have held that a disciplinary action may not be taken against an attorney based on his plea of no contest to a criminal offense. *See State Bar v. Hall*, 293 N.C. 539, 238 S.E. 2d 521. Perhaps the plea of no contest should be abolished. However, as it remains a plea that is viable, its viability should apply to the capital punishment statute unless changed by the General Assembly. In the absence of clear legislative direction, I do not believe that we should allow a plea of no contest to be the deciding factor as to whether a person receives life imprisonment or death. Accordingly, I dissent from so much of the majority opinion as upholds the death penalty in this case.